# 14-1877-cv

## United States Court of Appeals

*for the*

## Second Circuit

AAR ALLEN SERVICES, INC.,

*Plaintiff-Appellant,*

v.

FEIL 747 ZECKENDORF BLVD. LLC,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of New York, No. 13-cv-3241.
The Honorable **Jesse M. Furman**, Judge Presiding

## BRIEF AND SPECIAL APPENDIX OF PLAINTIFF-APPELLANT AAR ALLEN SERVICES, INC.

JOHN ALBERT BASINGER
BAKER & MCKENZIE LLP
452 Fifth Avenue
New York, New York 10018
Tel: (212) 626-4100
Fax: (212) 310-1600

MICHAEL A. POLLARD
WILLIAM LYNCH SCHALLER
JOHN M. MURPHY
PETER P. TOMCZAK
BAKER & MCKENZIE LLP
300 East Randolph Drive, Suite 5000
Chicago, Illinois 60601
Tel: (312) 862-8000
Fax: (312) 861-2899

*Attorneys for Plaintiff-Appellant, AAR Allen Services, Inc.*

 

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-appellant, AAR Allen Services, Inc., is a wholly-owned subsidiary of AAR Parts Trading, Inc.  AAR Parts Trading, Inc. is, in turn, a wholly-own subsidiary of AAR CORP., a corporation listed for public trading on the New York Stock Exchange.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF CONTENTS................................................................................ ii

TABLE OF AUTHORITIES ..........................................................................iv

JURISDICTIONAL STATEMENT ..................................................................1

    A.    Subject Matter Jurisdiction..................................................................1

        1.    Citizenship of Plaintiff..................................................................1

        2.    Citizenship of Defendant ............................................................1

    B.    Appellate Jurisdiction.........................................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................3

STATEMENT OF THE CASE .........................................................................4

I.     NATURE OF THE ACTION ...................................................................4

II.    STATEMENT OF FACTS ......................................................................7

    A.    The Garden City Property ...................................................................7

    B.    AAR's 2003 Sale and Leaseback Transaction .......................................7

    C.    AAR's Repurchase Rights in Paragraph 30 of the Lease .....................8

    D.    The Lease's Definitions of "Affiliate" and "Control" ........................11

    E.    AAR's Agreement With Jones Lang LaSalle ....................................12

    F.    The Jones Lang LaSalle Purchase Offer .............................................14

    G.    Feil 747's Rejection of Jones Lang LaSalle's Purchase Offer............15

    H.    Feil 747's Rejection of AAR's Repurchase Offer ..............................15

SUMMARY OF THE ARGUMENT ...............................................................16

ARGUMENT ..............................................................................................17

III.   STANDARD OF REVIEW....................................................................17

IV.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT, *SUA SPONTE*, AGAINST AAR  ..........................................18

A.     Paragraph 30 of the Lease Is Unambiguous ........................18

B.     Jones Lang LaSalle Has Never Been an "Affiliate" of AAR .............20

C.     AAR's Exercise of Its Purchase Option Was Not "Gamesmanship" or Otherwise Unfair to Feil 747 ...........26

V.    THE DISTRICT COURT ERRED IN DENYING AAR'S MOTION FOR SUMMARY JUDGMENT ..................31

A.     Feil 747 Was Required to Accept Jones Lang LaSalle's Offer Solely for the Purpose of Triggering AAR's Option .........31

B.     This Court Should Enter Summary Judgment in Favor of AAR ........34

CONCLUSION .................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aircraft Trading and Services, Inc. v. Braniff*,
819 F.2d 1227 (2d Cir. 1981) ................................................................ 36-37

*Applied Energetics, Inc. v. Newoak Capital Markets, LLC*,
645 F.3d 522 (2d Cir. 2011) ........................................................................20

*Barker v. Henderson, Franklin, Starnes & Holt*,
797 F.2d 490 (7th Cir. 1986) .......................................................................25

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) ........................................................................34

*Building Trades Employers' Educ. Assoc. v. McGowan*,
311 F.3d 501 (2d Cir. 2002) ........................................................................36

*Cable Sci. Corp. v. Rochdale Vill., Inc.*,
920 F.2d 147 (2d Cir. 1990) ........................................................................33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................35

*Champion Intl. Corp. v. Continental Cas. Co.*,
546 F.2d 502 (2d Cir. 1976) ........................................................................30

*Clarke v. Caldwell*,
132 A.D.2d 171, 521 N.Y.S.2d 851 (N.Y. App. Div. 1987).........................19

*Darnet Realty Associates LLC*,
153 F.3d 21 (2d Cir. 1998) ..........................................................................18

*Dimino v. Dimino*,
91 A.D.2d 1185, 459 N.Y.S.2d 164 (N.Y. App. Div. 1983)........................32

*Fishoff v. Coty, Inc.*,
634 F.3d 647 (2d Cir. 2012) ........................................................................18

*Goldberg & Connolly v. New York Cmty. Bancorp, Inc.*,
565 F.3d 66 (2d Cir. 2009) ..........................................................................20

*Greenfield v. Philles Records, Inc.*,
780 N.E.2d 166, 98 N.Y.2d 562 (N.Y. 2002)...............................................20

iv

*Guippone v. BHS&B Holdings LLC*,
    737 F.3d 221 (2d Cir. 2013) .......................................................................18

*In re Beck Indus., Inc.*,
    605 F.2d 624 (2d Cir. 1979) ................................................................. 27-28

*In re Delta Air Lines, Inc.*,
    608 F.3d 139 (2d Cir. 2010) .......................................................................33

*In re Met-L-Wood*,
    861 F. 2d 1012 (7th Cir. 1988) ...................................................................27

*James v. Zürich American Insurance Co. of Illinois*,
    203 F.3d 250 (3d Cir. 2000) .......................................................................27

*Leyda v. Allied Signal, Inc.*,
    322 F.3d 199 (2d Cir. 2003) .......................................................................26

*LIN Broad. Corp. v. Metromedia, Inc.*,
    542 N.E.2d 629, 74 N.Y.2d 54 (1989) .......................................................19

*Madison Ave. Leasehold, LLC v. Madison Bentley Assoc., LLC*,
    30 A.D.3d 1, 811 N.Y.S.2d 47 (N.Y. App. Div. 1st Dep't 2006) ................21

*Markan Corp. v. Plane's Cayuga Vineyard, Inc.*,
    24 A.D.3d 1264, 806 N.Y.S.2d 829 (N.Y. App. Div. 2005) ........................19

*Miller v. Wolpott & Abramson LLP*,
    321 F.3d 292 (2d Cir. 2003) .......................................................................18

*Mullins v. City of New York*,
    653 F.3d 104 (2d Cir. 2011) .......................................................................17

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
    784 F.2d 127 (2d Cir. 1986) .......................................................................30

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) .......................................................................21

*Ramsey v. Coughlin*,
    94 F.3d 71 (2d Cir. 1996) ...........................................................................31

*Ridinger v. Dow Jones & Co., Inc.*,
    651 F.3d 309 (2d Cir. 2001) .......................................................................26

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    13 N.Y.3d 398 (2009)..................................................................................27

*Royal & Sun Alliance Ins. PLC v. Rogers Transp. Mgmt. Servs.*,
   737 F. Supp. 2d 154 (S.D.N.Y. 2010) ............................................................33

*Sloane Overseas Fund, Ltd. v. Sapiens International Corp., N.V.*,
   941 F. Supp. 1369 (S.D.N.Y. 1996) ..............................................................25

*Story v. Wood*,
   166 A.D.2d 124, 569 N.Y.S.2d 487 (N.Y. App. Div. 1991)........................32

*Telenor Mobile Communc'n v. Storm, LLC*,
   587 F. Supp. 2d 594 (S.D.N.Y. 2008), *aff'd*, 584 F.3d 396
   (2d Cir. 2009).........................................................................................22, 23

*United States v. Corr*,
   543 F.2d 1042 (2d Cir. 1976) ...................................................................23, 24

*Waldman v. Reidinger*,
   423 F.3d 145 (2d Cir. 2005) .........................................................................24

*Wallace v. 600 Partners Co.*,
   205 A.D.2d 202, 618 N.Y.S.2d 298 (N.Y. App. Div. 1994)........................32

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*,
   304 F.3d 200 (2d Cir. 2002) .........................................................................20

## Statutes and Other Authorities

28 U.S.C. § 1291 ..................................................................................................3

28 U.S.C. § 1332 ..................................................................................................1

Fed. R. App. P. 3(a) ............................................................................................3

Fed. R. Civ. P. 56 ..............................................................................................35

17 CFR 230.405 ...........................................................................................11, 12

# JURISDICTIONAL STATEMENT

## A.     Subject Matter Jurisdiction

The District Court had original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. As discussed below, plaintiff is an Illinois citizen; the defendant and all persons related to it are not.

### 1.     Citizenship of Plaintiff

AAR Allen Services, Inc. ("AAR") is an Illinois corporation with its principal place of business in Wood Dale, Illinois.

### 2.     Citizenship of Defendant

Defendant Feil 747 Zeckendorf Blvd. LLC ("Feil 747") is a New York limited liability company with its principal place of business in New York City, New York.

The members of Feil 747 are: (i) Feil Family, LLC ("Feil Family"), a Delaware limited liability company; (ii) Jeffrey J. Feil, a citizen of New York; (iii) Jonathan M. Estreich, a citizen of New York; (iv) Randall Briskin, a citizen of Connecticut; and (iv) Laurence Newman, a citizen of New York.

The members of Feil Family are: (i) Jeffrey J. Feil; (ii) Greater Lakeside Corp., a Louisiana corporation; and (iii) Feil Properties, LLC ("Feil Properties"), a Delaware limited liability company.

The members of Feil Properties are: (i) Jeffrey J. Feil; (ii) Jeffrey J. Feil/Feil Properties Trust; (iii) Voorhis Partners, LLC, a Delaware limited liability company; (iv) MRBarry-FP, LLC, a Delaware limited liability company; and (v) Jaffe II Properties LLC, a Delaware limited liability company.

The co-trustees of Jeffrey J. Feil/Feil Properties Trust are Jay Anderson, a citizen of New Jersey, and Jonathan M. Estreich.

The members of Voorhis Partners, LLC are: (i) Carole Feil, a citizen of New York; (ii) Justin Derfner, a citizen of New York; (iii) Eric Derfner, a citizen of New York; (iv) The Justin Derfner 2001 Family Trust; and (v) The Eric Derfner 2001 Family Trust.

The co-trustees of the Justin Derfner 2001 Family Trust and the Eric Derfner 2001 Family Trust are Justin Derfner and Eric Derfner.

The members of MR-BarryFP LLC are: (i) Marilyn Barry, a citizen of Florida; (ii) Richard Barry, a citizen of New York; (iii) Mitchell Barry, a citizen of New York; and (iv) The Joanne LeWinter Trust.

The co-trustees of the Joanne LeWinter Trust are Richard Barry and Mitchell Barry.

2

The members of Jaffe II Properties LLC are (i) Judith Jaffe, a citizen of Florida; (ii) The Kenneth Jaffe 2002 Irrevocable Trust; (iii) The Alison Wilson 2002 Irrevocable Trust; (iv) The Jonathan Goldberg 2002 Irrevocable Trust; (v) The Ethan Chase Jaffe 2002 Irrevocable Trust; and (vi) The Alexa Simon Jaffe 2002 Irrevocable Trust.

The co-trustees of the five trusts which are members of Jaffe II Properties LLC are Carole Feil and Kenneth Jaffe, both citizens of New York.

### B.    Appellate Jurisdiction

This Court possesses jurisdiction pursuant to Federal Rule of Appellate Procedure 3(a) and pursuant to 28 U.S.C. § 1291.  This appeal is taken from a final order of judgment entered by the District Court on May 7, 2014.  SPA-11.[1] AAR timely filed its Corrected Notice of Appeal on June 4, 2014.  A-530.[2]

### STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred in entering summary judgment in favor of Feil 747 based upon its misinterpretation of the term "Affiliate," as defined in the 2003 Lease between AAR and Feil 747 (as assignee of iStar Garden City LLC) ("iStar").

---

[1] References to "SPA-00" are to the Special Appendix attached to this brief.

[2] References to "A-000" are to those materials contained in the parties' Joint Appendix.

2.      Whether the District Court erred in denying AAR's motion for summary judgment.

## STATEMENT OF THE CASE

### I.    NATURE OF THE ACTION

This action arises out of a 2003 sale and leaseback transaction involving commercial real estate located in Garden City, New York (the "Garden City Property"). In 2003, plaintiff-appellant, AAR, sold the Garden City Property to iStar for $14,800,000, and entered into a triple-net 20-year lease (the "Lease"). A-481. Paragraph 30 of the Lease gave AAR the right to repurchase the Garden City Property at a price of $16,280,000, if any third party that is not an "Affiliate" of AAR made an all-cash offer in an amount not less than $16,280,000 during the contractually specified window of August 1, 2012 to October 31, 2012. A-187-88; A-482-83. In 2008, iStar Garden City LLC sold the Garden City Property to Feil 747 and assigned the Lease to Feil 747. A-483.

In August 2012, AAR engaged Jones Lang LaSalle, Inc. ("Jones Lang LaSalle"), to make an all-cash $16,280,000 offer to purchase the Garden City Property for the purpose of triggering AAR's repurchase rights under Paragraph 30 of the Lease. A-222-24; A-486. Jones Lang LaSalle is a professional services and investment management company specializing in real estate whose shares are listed for public trading on the New York Stock Exchange. A-483-84. Jones Lang

4

LaSalle and AAR are not "Affiliates," as defined in the Lease. Specifically, Jones Lang LaSalle is not AAR's "Affiliate" because AAR does not exercise "Control" over Jones Lang LaSalle, which the Lease defines as "the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contracts or otherwise." A-141-42.

On August 14, 2012, Jones Lang LaSalle made a cash offer to purchase the Garden City Property for $16,280,000. A-118; A-226-29; A-488-89. Jones Lang LaSalle's purchase offer triggered AAR's right to repurchase the Garden City Property under Paragraph 30 of the Lease. Feil 747, however, refused to accept Jones Lang LaSalle's offer, and refused to honor AAR's exercise of its rights to purchase the Garden City Property. A-129; A-231; A-233-35; A-524.

On May 14, 2013, AAR filed a single-count complaint for specific performance of Feil 747's obligation under Paragraph 30 of the Lease to sell the Garden City Property to AAR. A-009-101.

On September 13, 2013, AAR moved for summary judgment. A-111-254. The District Court, Judge Jesse M. Furman, permitted Feil 747 to take limited discovery directed to the issues presented by AAR's summary judgment motion. A-108. Feil 747 opposed AAR's motion for summary judgment on the grounds that the undisputed facts support the following conclusions of law: (i) Jones Lang LaSalle is an "Affiliate" of AAR; (ii) Jones Lang LaSalle's purchase offer did not

5

trigger AAR's repurchase rights under the Lease because Jones Lang LaSalle was acting as AAR's agent; and (iii) Jones Lang LaSalle's purchase offer was legally insufficient to trigger AAR's purchase rights under the Lease because it was subject to conditions.  SPA-06.

On May 6, 2014, the District Court denied AAR's motion for summary judgment and granted summary judgment in favor of Feil 747 "although [Feil 747] ha[d] not moved for summary judgment."  SPA-10.  The District Court did not premise its denial of AAR's motion for summary judgment on a finding that a genuine issue of material fact exists.  SPA-01 ("The material facts are undisputed").  The District Court's summary judgment decision was based solely on an erroneous conclusion that, as a matter of law, Jones Lang LaSalle is an "Affiliate" of AAR within the meaning of the Lease.  SPA-07-08.  This conclusion, in turn, was based on a flawed interpretation of the term "Control," as defined in the Lease.  SPA-07-08.  In particular, the District Court erroneously concluded that AAR's engagement of Jones Lang LaSalle to make a purchase offer for the Garden City Property for the purpose of triggering AAR's repurchase rights vested AAR with "the power to direct or cause *the direction of the management and policies*" of Jones Lang LaSalle" (emphasis added).  SPA-07-08.

The District Court did not address Feil 747's argument that Jones Lang LaSalle's purchase offer was ineffective in triggering AAR's repurchase rights

because Jones Lang LaSalle was acting as AAR's agent. SPA-01-10. The District Court also did not address Feil 747's argument concerning the legal sufficiency of Jones Lang LaSalle's purchase offer. SPA-06.

On May 7, 2014, the District Court entered a Judgment in favor of Feil 747 and against AAR. SPA-11. On June 4, 2014, AAR filed its Corrected Notice of Appeal. A-530.

## II.    STATEMENT OF FACTS

### A.    The Garden City Property

AAR is engaged in the business of overhauling and repairing airframe parts and components used on aircraft operated by commercial airlines, the U.S. armed forces and other government agencies. A-480-81. AAR acquired the Garden City Property in 1979. A-480. The Garden City Property is a nine-acre property, including a 150,000 square foot office and testing facility, located at 747 Zeckendorf Boulevard, Garden City, New York. A-480. AAR uses the Garden City Property to conduct its business. A-481. AAR has been the sole occupant of the Garden City Property since 1979. A-481.

### B.    AAR's 2003 Sale and Leaseback Transaction

In October 2003, as a result of a downturn in the airline industry that followed 9/11, AAR entered into a sale and leaseback transaction for the Garden City Property. A-392 (at 10:16-13:17); A-481. AAR sold the Garden City Property to iStar, an affiliate of iStar Financial Inc., for a purchase price of

7

$14,800,000. A-481. So that AAR could continue to occupy and use the Garden City Property, AAR and iStar entered into the Lease, which is a 20-year, triple-net lease pursuant to which AAR would lease the Garden City Property from iStar. A-132-209; A-481. In 2008, iStar sold the Garden City Property to Feil 747 and assigned its interest in the Lease to Feil 747. A-483.

### C.    AAR's Repurchase Rights in Paragraph 30 of the Lease

AAR always intended to repurchase (or at least have the opportunity to repurchase) the Garden City Property. A-124; A-392 (at 11:3-6); A-393 (16:24-17:18). Accordingly, as part of the sale and leaseback transaction, AAR negotiated with iStar the right to repurchase the Garden City Property in 2013 -- ten years into the Lease -- for $16,280,000. A-392 (at 10:16-13:17); A-393 (at 16:24-17:18); A-397-98 (at 33:14-34:14); A-482. The repurchase price was negotiated at 110% of $14,800,000 (the amount paid to AAR for the Garden City Property) or $16,280,000. A-359 (at 40:3-12).

Paragraph 30 of the Lease sets forth AAR's repurchase rights. Paragraph 30 states, in relevant part:

> (b)    During the ROFR [Right of First Refusal] Period [August 1, 2012 to October 31, 2012], if Landlord receives an offer to sell the premises to a person who is not a Landlord Affiliate or an Affiliate of Tenant or Guarantor [i.e., AAR CORP.] which Landlord desires to accept, Landlord shall notify ("ROFR Notice") Tenant in writing of such event. Landlord agrees that if Landlord receives such an offer to sell the Premises during the

8

> ROFR Period for a purchase price of $16,280,000 or greater on an all cash basis, Landlord shall agree to accept such offer solely for purposes of this paragraph 30 and complying with the provisions of this paragraph 30. The date such notice is given is the "ROFR Notice Date". The ROFR Notice shall state that Landlord intends to sell the Premises to a Person that is not a Landlord Affiliate or an Affiliate of Tenant or Guarantor for the specified price in such offer ("ROFR Notice Price") on an all-cash basis. Tenant shall have the right, at its option, to make an offer ("Tenant's ROFR Offer") to purchase the Premises in accordance with Paragraph 29 on November 1, 2013, (notwithstanding any other proposed closing date in any offer referenced in the ROFR Notice) for the ROFR Notice Price, which offer shall be an all cash offer.

A-187-88; A-482-83.

At the "last minute" shortly before the sale and lease-back closed, AAR and iStar decided to structure this purchase option in the form of a right of first refusal to enable AAR to receive favorable accounting treatment for the Lease. A-400 (at 42:15-25). Although labeled a "ROFR," Paragraph 30 provided AAR with a *de facto* option to repurchase the Garden City Property for $16,280,000, if a non-"Affiliate" of AAR made an all-cash offer of an amount not less than $16,280,000 during the contractually specified window of August 1, 2012 to October 31, 2012. A-187-88; A-392 (at 11:19 – 12:23); A-482. In the undisputed testimony elicited by Feil 747's counsel, AAR's President, Timothy J. Romenesko, who negotiated the Lease on behalf of AAR (A-391, at 8:3-11), explained:

9

Q    Your testimony is a right of first refusal and a purchase option are the same thing?

A    In this instance, yes.

Q    Could you explain why that is?

A    Well, the transaction always contemplated a purchase option, and the purchase option in this case was structured as a right of first refusal.

Q    Why was it structured as a right of first refusal in this case?

A    At the time of this transaction in 2003, the company was just coming off of the effects of 9/11, the capital markets were basically shut down, the banks weren't willing to extend credit to the company or many companies. So I had a – I was working with my covenants, and one of my covenants allowed me to do sale leasebacks, so I wanted to make sure that this transaction wasn't viewed by the banks, who were very difficult at the time, I wanted to make sure that the transaction wasn't viewed as anything other than a sale leaseback. The concern was that – that it would be viewed as a financing as opposed to a sale leaseback for purposes of the covenants. So at the advice of our counsel, at the advice of our advisor who, at the time, was LaSalle Bank, we decided to go belts and suspenders and make – and convert the or modify the purchase option into this right of first refusal so there could be no confusion as to whether or not this was a sale leaseback or some sort of financing.

A-392 (at 11:19-12:23).

*    *    *

… [W]hen we entered into the transaction that the – the purchase option at the last minute had been structured in the form of this right of first-refusal, and that the – that that the purchase option contemplated two scenarios: one, where the valuation of the property was below 110 percent of the original price; and one where it was above. And in the case of the situation where it was below the $16,280,000 [i.e., 110% of the

10

> $14,800,000 sale price in 2003], the owner didn't have an
> obligation to sell us the property. But in the instance where it
> was $16,280,000 or higher, they [the landlord] had a –
> obligation, and we [i.e., AAR] had a unilateral right to
> repurchase the property.

A-399 (at 41:08-21); A-394 (at 19:6-16). No contrary evidence was identified by

Feil 747.

### D.    The Lease's Definitions of "Affiliate" and "Control"

As part of their effort to ensure favorable lease accounting treatment for

AAR, AAR and iStar also included in the Lease the requirement that AAR's

purchase rights be triggered by an offer from a non-"Affiliate." A-400 (at 43:25-

44:19). AAR and iStar used a definition of "Affiliates" that closely tracks the

definition of "Affiliate" used under the federal securities laws. The Lease defined

"Affiliates" as follows:

> "Affiliates" means Persons (other than individuals),
> controlled by, controlling, or under common control with
> Tenant or Guarantor.

A-141; A-484. *Compare* 17 CFR 230.405 ("Affiliate. An affiliate of, or person

affiliated with, a specified person, is a person that directly, or indirectly through

one or more intermediaries, controls or is controlled by, or is under common

control with, the person specified.").

AAR and iStar also used a definition of "Control" that closely tracks the

definition of "Control" used under the federal securities laws. The Lease defined

"Control" as follows:

11

> "Control" (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contracts or otherwise.

A-142; A-485.  *Compare* 17 CFR 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise").

### E.    AAR's Agreement With Jones Lang LaSalle

In approximately March or April 2012, as the 90-day window for AAR to repurchase the Garden City Property through Paragraph 30 of the Lease drew near, AAR contacted Jones Lang LaSalle to determine whether Jones Lang LaSalle would assist AAR in acquiring the Garden City Property.  A-486.

Jones Lang LaSalle is a financial and professional services firm specializing in commercial real estate services and investment management.  A-483-84.  Jones Lang LaSalle's shares are listed for public trading on the New York Stock Exchange.  A-484.  AAR CORP. is a separate corporation that is also listed for public trading on the New York Stock Exchange.  A-484.  Neither AAR nor its affiliates has (i) held voting securities or any form of economic or legal interest in

Jones Lang LaSalle; (ii) possessed authority to appoint or influence the appointment of Jones Lang LaSalle's officers, directors or other members of management; or (iii) otherwise possessed authority to direct the "management and policies" of Jones Lang LaSalle.  A-127; A-485.

On August 14, 2012, Jones Lang LaSalle and AAR CORP. entered into an agreement pursuant to which Jones Lang LaSalle would assist AAR CORP. in acquiring the Garden City Property for the lowest price possible.  A-222-24; A-486.  AAR CORP. and Jones Lang LaSalle determined that the best route for this purpose was for Jones Lang LaSalle to make a purchase offer triggering AAR's $16,280,000 repurchase right set forth in Paragraph 30 of the Lease.    A-128; A-486.  AAR CORP. and Jones Lang LaSalle agreed that "[i]f AAR purchases the [Garden City] Property, Jones Lang LaSalle will be paid a $365,000 advisory fee upon closing."  A-128; A-222-24; A-486-87.

Jones Lang LaSalle understood that if its purchase offer was accepted by Feil 747, and AAR was unable to exercise its repurchase rights, Jones Lang LaSalle could end up purchasing the Garden City Property from Feil 747.  A-128; A-363 (at 168:22-25) ("That could happen.  It wouldn't be our first choice.  It wouldn't be something we would want.  But that could happen.  It's a risk in the deal."); A-487-88.  Although AAR at all times wanted to exercise its option to repurchase the Garden City Property, AAR did not have a contractual obligation to

Jones Lang LaSalle to do so.  A-128; A-222-24; A-403 (at 54:1-56:23); A-487-88.

As such, if AAR were unable to purchase the Garden City Property for some unforeseen reason, such as "some kind of collapse in the banking system like that which happened in 2008," it was possible that Jones Lang LaSalle would end up purchasing the Garden City Property for itself.  A-403-404 (at 54:21-56:3-23; and 58:18-60:17).  It was this risk that Jones Lang LaSalle cited as justification for the $365,000 it intended to charge AAR.  A-404-05 (at 61:20-62:8).

### F.    The Jones Lang LaSalle Purchase Offer

On August 14, 2012, Jones Lang LaSalle made an offer to Feil 747 to purchase the Garden City Property for $16,280,000 in cash.  A-118; A-226-29; A-466-70; A-488-89).  Jones Lang LaSalle's August 14, 2012 offer letter contained the "basic terms and conditions" pursuant to which it would purchase the Garden City Property.  A-467.  The offer letter also stated that "[t]his offer is not binding on either party until made part of a mutually executed" purchase and sale agreement.  A-469.  The offer letter also included the following provisions:

> Notwithstanding anything to the contrary in this Purchase Offer, this Purchase Offer (a) is only a list of proposed points that may or may not become part of an eventual PSA, (b) is not intended to constitute an agreement to execute the PSA or any purchase and sale agreement (or other agreement) in the future, and (c) is not intended to constitute the agreement of the owner(s) to negotiate a sale of the Properties to purchaser, or for the Purchaser to

14

> negotiate a purchase of the properties from the owner(s). In the event that the Seller and Purchaser enter into negotiations for the sale of the Properties, both the Seller and Purchaser reserve the right, in their sole discretion, to terminate such negotiations at any time. It is the intention and understanding of the Purchaser that the only binding instrument to be executed between Purchaser and the Seller with respect to the purchase and sale of the properties shall be the PSA….

A-469.

### G.    Feil 747's Rejection of Jones Lang LaSalle's Purchase Offer

Feil 747 did not, for the purpose of complying with Paragraph 30 of the Lease, accept Jones Lang LaSalle's purchase offer. A-489. Rather, on August 16, 2012, Feil 747's CEO, Jeffrey Feil, sent Jones Lang LaSalle an e-mail stating as follows:

> "Thank you for your unsolicited offer to purchase the property located at 747 Zeckendorf blvd. this [sic] is to advise you that it is not for sale."

A-474; A-524.

### H.    Feil 747's Rejection of AAR's Repurchase Offer

On August 15, 2012, Jones Lang LaSalle provided AAR with a copy of the Jones Lang LaSalle purchase offer. A-129; A-489. On August 29, 2012, AAR delivered to Feil 747 a notice stating, in part, as follows: "[AAR Allen Services] hereby exercises its right to purchase the Premises on an all cash basis at the ROFR Notice Price [i.e., $16,280,000]." A-129; A-231; A-490. On September 10, 2012, counsel for Feil 747 delivered a rejection letter to AAR's counsel. A-129; A-233-

15

35; A-490 ("Please consider this letter [Feil 747's] rejection of [AAR's] purported 'ROFR Offer'.").

On May 14, 2013, AAR filed its complaint for specific performance. A-009-101. Following discovery, the District Court on May 6, 2014 denied AAR's motion for summary judgment and, *sua sponte*, granted summary judgment in favor of Feil 747. This appeal followed.

## SUMMARY OF THE ARGUMENT

Under the unambiguous terms of the Lease, AAR's right to repurchase the Garden City Property was triggered when Jones Lang LaSalle – a firm that is not an "Affiliate" of AAR – made a $16,280,000 cash offer to purchase the Garden City Property during the contractually-specified window of August – October 2012. This was precisely the outcome the original contract parties, AAR and iStar, contemplated when they signed the Lease in 2003, as the undisputed testimony showed.

The District Court erred in denying AAR's summary judgment motion, and in granting summary judgment in favor of Feil 747, *sua sponte*, on the ground that Jones Lang LaSalle was an "Affiliate" of AAR. In so ruling, the District Court misconstrued the legally determinative definitions of "Affiliate" and "Control" set forth in the Lease, and ignored the undisputed testimony corroborating AAR's construction of the Lease. The Lease defined "Affiliate" as "[p]ersons (other than

16

individuals), controlled by, controlling, or under common control with [AAR]." A-141; A-484.   The Lease defined "Control" as "the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contracts or otherwise."  A-142; A-485.

AAR and Jones Lang LaSalle are separate public companies.  It is undisputed that AAR does not control the "management and policies" of Jones Lang LaSalle.  Indeed, AAR did not even have the right, by contract or otherwise, to compel Jones Lang LaSalle to sell the Garden City Property to AAR.  On this record, it was legal error for the District Court to conclude that Jones Lang LaSalle was an "Affiliate" of AAR.  For these reasons, and for the additional reasons set forth below, this Court should exercise *de novo* review, reverse the District Court's judgment, and enter judgment in favor of AAR.

## ARGUMENT

### III.   STANDARD OF REVIEW

The standard of review from an order granting or denying summary judgment is *de novo*.  *Mullins v. City of New York*, 653 F.3d 104, 113 (2d Cir. 2011) ("We review *de novo* a district court's grant or denial of summary judgment, viewing the record in the light most favorable to the party against whom summary judgment is sought") (internal quotation marks and citation omitted); *see also*

17

*Guippone v. BHS&B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013) ("Our standard of review for both motions to dismiss and motions for summary judgment is *de novo*") (quoting *Miller v. Wolpott & Abramson LLP, 321 F.3d* 292, 300 (2d Cir. 2003).) In addition, this Court's review of the District Court's interpretation of the Lease in issue is *de novo*. *See Fishoff v. Coty, Inc.*, 634 F.3d 647, 652 (2d Cir. 2012) ("Contract interpretation is a question of law that we review *de novo*").

Where "cross-motions for summary judgment are involved, it is necessary to adopt a Janus-like dual perspective." *Darnet Realty Associates LLC,* 153 F.3d 21, 22 (2d Cir. 1998). In granting summary judgment against AAR notwithstanding that Feil 747 had not filed a motion requesting such relief, the District Court necessarily treated the factual issues as undisputed. This Court should review, *de novo*, both the District Court's *sua sponte* entry of summary judgment against AAR and the District Court's denial of summary judgment in favor of AAR.

## IV.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT, *SUA SPONTE*, AGAINST AAR

### A.  Paragraph 30 of the Lease Is Unambiguous

Paragraph 30 grants AAR two sets of rights. The first, which never came into play, is found in Paragraph 30(b)'s first sentence. Paragraph 30(b)'s first sentence operates to grant AAR a type of first refusal right: if during the specified three-month window Feil 747 received an offer from a non-"Affiliate," for an amount *less than $16,280,000*, which offer Feil 747 "desire[d] to accept," then Feil

18

747 had a duty to notify AAR and AAR had a right to acquire the property on an all-cash basis at the offered price. *See LIN Broad. Corp. v. Metromedia, Inc.*, 542 N.E.2d 629, 630, 74 N.Y.2d 54, 56 (1989) (a traditional ROFR "does not give its holder the power to compel an unwilling owner to sell"); *Markan Corp. v. Plane's Cayuga Vineyard, Inc.*, 24 A.D.3d 1264, 1265, 806 N.Y.S.2d 829, 830 (N.Y. App. Div. 2005) (right of first refusal clauses are typically triggered "when an owner decides to sell the property to a third party at an agreed-upon price").

The second set of rights, which is the one at issue, is found in Paragraph 30(b)'s second sentence. Paragraph 30(b)'s second sentence operates as an option: AAR had a right to purchase the property, and Feil 747 had a corresponding duty to sell the property, if Feil 747 received an offer from a non-"Affiliate" for "$16,280,000 or greater on an all-cash basis" during the same specified three-month window. *See Clarke v. Caldwell*, 132 A.D.2d 171, 173, 521 N.Y.S.2d 851, 853 (N.Y. App. Div. 1987) (explaining that a purchase option is an "absolute and unconditional promise to sell at a certain determinable price within a period of time"). Unlike the conventional right of first refusal set forth in the first sentence of Paragraph 30(b), which pertains to non-"Affiliate" offers for *less than* $16,280,000, AAR's exercise of its right to purchase the Garden City Property for *not less than* $16,280,000 did not turn on Feil 747's "desire to accept" Jones Lang LaSalle's offer. Thus, Jones Lang LaSalle's all-cash offer at $16,280,000 triggered

AAR's right to purchase the Garden City Property, regardless of whether Feil 747 wanted to sell it (Lease, ¶ 30(b)) ("*shall* agree to accept") (emphasis added). A-187-88. *See Goldberg & Connolly v. New York Cmty. Bancorp, Inc.*, 565 F.3d 66, 72 (2d Cir. 2009) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") (*quoting Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170, 98 N.Y.2d 562, 569 (N.Y. 2002)); *see also Applied Energetics, Inc. v. Newoak Capital Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011) (treating the word "shall" in the phrases "shall be adjudicated" and "shall be resolved through binding arbitration" as "mandatory"); *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 215 (2d Cir. 2002) (characterizing "shall have the right of first refusal" as "mandatory language").

## B.    Jones Lang LaSalle Has Never Been an "Affiliate" of AAR

The linchpin of the District Court's decision is its erroneous construction of the term "Affiliate." The District Court erroneously concluded that Jones Lang LaSalle was AAR's "Affiliate" because, under its agreement with Jones Lang LaSalle, "AAR effectively required Jones Lang LaSalle to do exactly what AAR wanted it to do, namely make a purchase offer for the Garden City Property."

SPA-08.   The District Court erroneously focused on a single phrase in the definition of "Control" ("whether by contract or otherwise") while ignoring the antecedent language this clause modifies ("the power to direct … the *management and policies*" of another company).   Even if AAR had authority under its agreement with Jones Lang LaSalle to cause Jones Lang LaSalle to make its purchase offer, which it did not, such authority would not have given AAR "the power to direct or cause the direction of the *management and policies*" of Jones Lang LaSalle, as required under the definition of "Control" found in the Lease.

The discrete real estate services contract between AAR and Jones Lang LaSalle does not amount to "Control" under the familiar securities law definition explicitly used in the Lease. "Control" under the securities law definition used in the Lease means the ability to participate in the day-to-day affairs of the corporation or to direct the corporation's officers and directors in setting corporate policies.  *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp*., 96 F.3d 1151, 1162 (9th Cir. 1996) ("As the definition suggests, our inquiry must revolve around the 'management and policies' of the corporation, not around discrete transactions."). *See also Madison Ave. Leasehold, LLC v. Madison Bentley Assoc.*, *LLC*, 30 A.D.3d 1, 7-8, 811 N.Y.S.2d 47, 52 (N.Y. App. Div. 1st Dep't 2006) ("[W]here a word [in a contract] has attained the status of a term of art and is used in a technical

context, New York courts often adopt the technical meaning, developed in existing law, over the common, ordinary meaning").

In support of its erroneous conclusion, the District Court relied upon the district court's opinion in *Telenor Mobile Communc'n v. Storm, LLC*, 587 F. Supp. 2d 594 (S.D.N.Y. 2008), *aff'd* 584 F.3d 396 (2d Cir. 2009).   SPA-08-09. However, the court in *Telenor* rejected the type of "awkward and cramped" interpretation of "Control" that the District Court embraced in this case. *Id.* at 606. At issue in *Telenor* was the question of whether a third party to a shareholders agreement was an "Affiliate" of a contracting party.   As in this case, the shareholders agreement in *Telenor* defined "Affiliate" as any entity that "'directly or indirectly controls, or is under common control with, or is controlled by'" another entity.  *Id.* at 605.  The shareholders agreement also defined "Control" in a manner substantively identical to the definition of "Control" at issue in this case: "the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of a Person."  *Id*. at 605.

The court in *Telenor* correctly held that the phrase, "ownership of securities or partnership or other ownership interests, by contract or otherwise," is "a list of the sources" of the "power to direct or cause the direction of management or

policies." *Id*. at 606. Such power may arise through ownership, by contract or otherwise. *Id*. at 606. As the court explained,

> … Telenor's interpretation more reasonably defines "control." Ownership is not the only way in which one person or entity may control another. Contractual arrangements, such as shareholder agreements, employment contracts, or agency or other commercial contracts, can allow one entity to wield significant power over another.
>
> \*   \*   \*
>
> This conclusion is fortified by the fact that the contractual provision appears to be modeled on other legal documents that define "control" broadly, for similar purposes. Thus, Telenor's interpretation squares with the interpretation of the almost identical definition of "control" used by the SEC in defining the scope of "control person" liability under the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

*Id.* at 606. *Telenor* supports AAR's position rather than the conclusion reached by the District Court.

The District Court's reliance on *United States v. Corr,* 543 F.2d 1042 (2d Cir. 1976), is similarly misplaced. SPA-08. As does *Telenor*, this Court's decision in *Corr* actually supports the conclusion that Jones Lang LaSalle was not AAR's "Affiliate." In *Corr*, the government premised its charge that Corr violated the federal securities laws on Corr's alleged status as a "control person" of Judo, Inc. In his defense, Corr argued that the because Judo's CEO owned more than 50% of the outstanding stock, Corr could not qualify as a "control person." *Id*. at 1050.

23

This Court in *Corr* correctly stated that the question of "control" "depends upon the totality of the circumstances including an appraisal of *the influence upon management and policies of a corporation* by the person involved," and then held as follows:

> In the present case the evidence was overwhelming that Corr was responsible for numerous and essential programs of Judo including financing of Judo. He controlled Judo's financial relationship with the public and was able to exercise authority independent of Mackey and at the same time influence the authority exercised by Mackey.

*Id*. at 1050 (emphasis added). Here, even if AAR could influence Jones Lang LaSalle in connection with Jones Lang LaSalle's purchase offer for the Garden City Property, such influence would fall far short of the level of "Control" exercised by Corr over the "management and policies" of Judo.

AAR has never exercised "Control" over Jones Lang LaSalle. Specifically, the undisputed evidence shows that AAR does not: (i) hold voting securities or any form of economic or legal interest in Jones Lang LaSalle; (ii) possess authority to appoint or influence the appointment of Jones Lang LaSalle's officers, directors or other members of management; (iii) have day-to-day involvement or corporate power over publicly-traded Jones Lang LaSalle; or (iv) otherwise possess authority to direct the "management and policies" of Jones Lang LaSalle. A-127; A-483-85. *Cf. Waldman v. Reidinger*, 423 F.3d 145, 151-53 (2d Cir. 2005) (holding that

24

trustee was not an "affiliate" where trust instrument did not grant trustee voting control over Olsten Corporation); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (neither law firm nor accounting firm which rendered services to corporation which sold bonds and notes in violation of federal securities laws had ability to control corporation: the "ability to persuade and give counsel is not the same thing as 'control,' which almost always means the practical ability to *direct* the actions of the people who issue or sell the securities") (emphasis in original); *Sloane Overseas Fund, Ltd. v. Sapiens International Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (following *Barker* and holding that even director status did not establish control).

Feil 747 did not identify any evidence that AAR possessed "the power to direct or cause the direction of the management and policies of [Jones Lang LaSalle], whether through the ownership of voting securities, by contracts or otherwise."   Rather, Feil 747 simply asserted the bald conclusion that AAR possessed such power: (i) by virtue of AAR's agreement with Jones Lang LaSalle, pursuant to which Jones Lang LaSalle made its purchase offer; and (ii) because "AAR and Jones Lang [LaSalle] had a principal-agent relationship which granted AAR the power to direct policies and management of Jones Lang [LaSalle] with respect to the Garden City Property."  SPA-06; A-484-85.

In short, there is neither legal nor factual support for the District Court's conclusion that Jones Lang LaSalle was an "Affiliate" of AAR.  To the contrary, both the undisputed facts and the applicable case law compel the conclusion that Jones Lang LaSalle was not AAR's "Affiliate" within the meaning of the Lease.

### C.  AAR's Exercise of Its Purchase Option Was Not "Gamesmanship" or Otherwise Unfair to Feil 747

In its Order and Opinion, the District Court stated that AAR's attempt to exercise its repurchase rights was (i) a "sort of gamesmanship" and (ii) an attempt to "employ trickery and deceit to obtain a result for which it did not bargain in the first instance."  SPA-07-09.  These assertions simply ignored the unambiguous terms of Paragraph 30 of the Lease negotiated by AAR and iStar in 2003, as well as the undisputed evidence showing the rationale for those terms.

Feil 747 did not argue in the District Court that Paragraph 30 of the Lease is ambiguous.  *See Leyda v. Allied Signal, Inc.*, 322 F.3d 199, 207 (2d Cir. 2003) (arguments not made in the district court are waived on appeal).  However, even if Feil 747 had made such an argument, the only and undisputed evidence, which was offered by AAR, shows that AAR and iStar intended to enable a non-"Affiliate" intermediary, such as Jones Lang LaSalle, to trigger AAR's right to repurchase. Feil 747 identified no evidence to the contrary.  *See Ridinger v. Dow Jones & Co., Inc.*, 651 F.3d 309, 317 (2d Cir. 2001) ("If [plaintiff] believed there were genuine issues of material fact to be tried, so as to preclude summary judgment, it was

incumbent on him to so inform the district court and to do so by the offer of admissible evidence"). Here, of course, AAR and iStar negotiated the Lease. Feil 747 was merely iStar's assignee. Feil 747 did not negotiate the Lease and could not itself testify about what the contracting parties intended in 2003. *See James v. Zürich American Insurance Co. of Illinois,* 203 F.3d 250, 255-57 (3d Cir. 2000) (where contracting parties agree on the meaning of their agreement, a third party's interpretation of the agreement is irrelevant).

Even if one were to accept the characterization that Jones Lang LaSalle acted as AAR's "undisclosed agent" or "straw man," the only qualification under the Lease is that the offeror not be an "Affiliate" of AAR. The Lease did not prohibit use of an undisclosed agent, nor did the Lease require either the Landlord or Tenant to disclose its use of an agent as its triggering intermediary under Paragraph 30. *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) ("Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (internal quotes omitted). Absent a contractual provision to the contrary, there is nothing nefarious about using an "agent for an undisclosed principal." *See In re Met-L-Wood*, 861 F. 2d 1012, 1019 (7th Cir. 1988) (Pipin's use of "undisclosed agent" to purchase assets of Pipin's bankrupt enterprise was not "discreditable"); *In re Beck Indus., Inc.*, 605 F.2d 624,

27

636 (2d Cir. 1979) ("an agent may bid at a judicial sale on behalf of an undisclosed principal"). To be sure, nothing in AAR's agreement with Jones Lang LaSalle provided AAR with the power to direct or cause the direction of Jones Lang LaSalle's "management and policies," Jones Lang LaSalle's undisclosed agent status notwithstanding. A-222-24.

Moreover, the District Court's "below-market price" assertion disregarded the bargain struck by the parties and memorialized in Paragraph 30. SPA-07. The minimum $16,280,000 option price was negotiated in 2003 as 110% of the $14,800,000 iStar paid AAR for the Garden City Property:

> The $16,280,000 was determined at the time in August of 2003 as 110 percent of the – the value of the sale leaseback, which I believe was $14,750,000 [actually $14,800,000], so it was always contemplated that we would repurchase the property for 110 percent of the – of the price that we received, or the price that we sold it for at the time, okay, and – and that was designed to give the owner a 9 percent yield, so that's how we came up with the $16,280,000 at the time of the – at the time of the sale leaseback.

A-399 (at 40:3-12). The option price selected in 2003 was not tied to some prediction of what the "market value" would be during a three-month window nearly 10 years later. This is precisely why Paragraph 30 does not use the phrase "market value" or otherwise refer to that concept.

Nor was this option price unfair, as the District Court implied. SPA-07, 09. If Feil 747 viewed the $16,280,000 offer as too low, Feil 747 had the express right,

under Paragraph 30(b) of the Lease, to obtain a higher offer from its own intermediary that was not a "Landlord Affiliate."  A-187-88.  ("[I]f Landlord receives an offer to sell the Premises to a person who is not a Landlord Affiliate or an Affiliate of Tenant or Guarantor. . . .").  A-409-10 (at 80:21-83:9).  Indeed, AAR feared Feil 747 would exercise this very right and sell the Garden City Property to another buyer.  A-409-10 (at 80:21-82:13).

None of this analysis is undercut by the District Court's reference to Jones Lang LaSalle's preparation of a proposed "script" for AAR to use in an anticipated telephone conversation with Feil 747, which script "suggested that AAR falsely represented [to Feil 747] that [AAR] was not involved in, or even aware of Jones Lang's purchase offer."  SPA-04-05.  Regardless of the merits or demerits of the proposed script, it is undisputed that AAR neither asked Jones Lang LaSalle to prepare this script nor used this or any other script in its communications with Feil 747.  A-279-280 (at 84:3-13; 86:15-22; and 87:13-20); A-525-26.  Thus, this unused "script" evidence was utterly immaterial and certainly was not a basis to deny AAR's  summary judgment motion, let alone a basis to grant summary judgment against AAR *sua sponte*.

Finally, far from employing "trickery and deceit" to gain an unfair advantage, AAR's use of a non-"Affiliate," such as Jones Lang LaSalle, was precisely what the original contract parties bargained for and precisely what the

29

original parties based their contract price upon. SPA-09. The odds of a non-"Affiliate" randomly appearing ten years into the Lease and making an unsolicited $16,280,000 all-cash offer during a tiny three-month window would be infinitesimal. A far simpler explanation, fully supported by the Lease and the evidence, is that AAR wanted, needed, and secured the right to use a non-"Affiliate" to trigger AAR's $16,280,000 repurchase rights.

In summary, if, as the District Court concluded, the Lease prohibited AAR from causing a third party from making an offer to trigger AAR's purchase rights, then the Lease terms would have no meaning and bestow no rights on AAR. It would be inconceivable to expect that a third party, without having been contacted by AAR, would acquire knowledge of the Lease's terms and then make the contemplated cash offer within the contractually specified three-month window. *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (quoting *Champion Intl. Corp. v. Continental Cas. Co.*, 546 F.2d 502, 505 (2d Cir. 1976) ("[T]he meaning of particular language found [in a contract] should be examined 'in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes'"). Had the parties intended to restrict AAR from arranging for a non-"Affiliate" to trigger its purchase option, such restriction would have been included in the Lease.

30

## V. THE DISTRICT COURT ERRED IN DENYING AAR'S MOTION FOR SUMMARY JUDGMENT

As noted above, the District Court did not address two arguments advanced by Feil 747 in opposition to AAR's motion for summary judgment, namely that Jones Lang LaSalle's purchase offer was ineffective in triggering AAR's repurchase rights because (i) Jones Lang LaSalle was acting as AAR's "agent"; and (ii) Jones Lang LaSalle's purchase offer was legally insufficient. SPA-06. AAR has addressed the former argument above in Part I, Section D of this brief. Feil 747's latter argument is addressed below.

### A. Feil 747 Was Required to Accept Jones Lang LaSalle's Offer Solely for the Purpose of Triggering AAR's Option

In opposition to AAR's motion for summary judgment, Feil 747 argued that because the purchase offer made by Jones Lang LaSalle was subject to conditions, Feil 747 was not required to accept it. As set forth in its Opinion and Order, the District Court declined to address this argument. SPA-06. However, because the facts relevant to the legal sufficiency of Jones Lang LaSalle's purchase offer are undisputed, this Court should determine, as a matter of law, that under Paragraph 30 of the Lease, Feil 747 was required to accept Jones Lang LaSalle's purchase offer for the purpose of triggering AAR's repurchase rights.

As an initial matter, Paragraph 30 of the Lease did not require a "binding" offer, a "firm" offer or an "unconditional" offer—it called only for an all-cash

31

"offer" of $16,280,000.   *See Wallace v. 600 Partners Co.*, 205 A.D.2d 202, 208, 618 N.Y.S.2d 298, 302 (N.Y. App. Div. 1994) (rejecting invitation to construe a term to include qualifying phrases such that "determination" is found to mean "determination by appraisal," and observing that "it is incumbent on the court, when interpreting a contract, to give the words and phrases contained therein their ordinary, plain meaning"); *Dimino v. Dimino*, 91 A.D.2d 1185, 1186, 459 N.Y.S.2d 164, 166 (N.Y. App. Div. 1983) ("The term 'property' has a broad everyday meaning and, contrary to the husband's position, there is nothing in the agreement to indicate that paragraph 11 was meant to apply only to the husband's noncorporate stock property.").   Jones Lang LaSalle's purchase offer qualified as an "offer" under New York contract interpretation principles, notwithstanding that the Jones Lang LaSalle purchase offer contained certain conditions.  *See Story v. Wood*, 166 A.D.2d 124, 128-29, 569 N.Y.S.2d 487, 489 (N.Y. App. Div. 1991) (rejecting the argument that a conditional offer does not trigger a right of first refusal in a real estate contract).

More important, Feil 747's construction of the word "offer" in Paragraph 30 of the Lease is contrary to the overall language and purpose of Paragraph 30.  The relevant question is not whether the Jones Lang LaSalle purchase offer, if accepted, would have imposed an unconditional obligation upon Jones Lang LaSalle to purchase the Garden City Property.  Rather, the relevant question under Paragraph

30 is whether Feil 747 was required to "accept such offer *solely for purposes of this paragraph 30 and complying with the provisions of this paragraph 30*" (emphasis added).  A-187-88.

In opposing AAR's summary judgment, Feil 747 focused on the word "offer" but ignored the language surrounding the word "offer," namely that Feil 747 had to "accept [Jones Lang LaSalle's] offer *solely for purposes of this paragraph 30* and complying with the provisions of this paragraph 30" (emphasis added).  Contracts should be construed to give every word meaning.  *See In re Delta Air Lines, Inc.* 608 F.3d 139, 146 (2d Cir. 2010) ("While '[t]he best evidence of what parties to a written agreement intend is what they say in their writing,' . . . '[e]ach word must be considered along with not only all the other words that surround it, but also the history and education of the parties, the nature of the contract, the purposes of the parties, and all other relevant circumstances'").

The purpose of this particular language was to enable the intermediary to trigger AAR's option rights; the purpose was not to enable the intermediary to acquire the Garden City Property for itself.  *See Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir. 1990)  ("a court should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'"); *Royal & Sun Alliance Ins. PLC v. Rogers Transp. Mgmt. Servs.*, 737 F. Supp. 2d 154, 161 (S.D.N.Y.

2010) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.") (internal quotes omitted).  Thus, taken in context, this "solely for the purposes of this paragraph 30" language makes it clear that Jones Lang LaSalle was not required to make an unconditional "offer" that would bind Jones Lang LaSalle itself.

In summary, the unambiguous terms of Paragraph 30 accurately reflect the contract parties' intentions when the Lease was executed in 2003.  AAR bargained for a purchase option that would be triggered by the purchase offer of a non-"Affiliate" intermediary during a three-month window.   Jones Lang LaSalle was not an "Affiliate" of AAR.  Thus, under Paragraph 30, Feil 747 was required  to accept Jones Lang LaSalle's offer "solely for purposes of" giving effect to AAR's repurchase rights.

### B.    This Court Should Enter Summary Judgment in Favor of AAR

The District Court granted Feil 747 summary judgment notwithstanding that Feil 747 had not filed a motion requesting such relief.  A district court may, without notice, grant summary judgment for a non-moving party, provided that the party against whom summary judgment is granted is not deprived of an opportunity to bring forward evidence that would affect the district court's *sua sponte* determination. *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139-40 (2d Cir.

2000) ("[W]here it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law") (citing *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996)).

Here, in addition to misinterpreting the unambiguous terms of the Lease, the District Court ignored the undisputed evidence of the intent and business expectations of the contracting parties when the Lease was negotiated in 2003. In its opposition to AAR's motion for summary judgment, Feil 747 offered no evidence to the contrary, although it took discovery on these issues before responding to AAR's motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavit, or by the 'depositions, answers to interrogatories, and admissions on file; designate specific facts showing that there is a genuine issue for trial.'") (quoting FRCP 56).

The District Court nowhere acknowledged that the contract language is fully consistent with AAR's evidence of the intentions of the original contract parties, AAR and iStar. A-124-26; A-187-88; A-391 (at 8:3-11); A-392 (at 10:16-13:10 and 11:19-12:23); A-393 (at 16:24-17:18); A-397-98 (at 33:14-34:14); A-399 (at

40:3-12 and 41:08-21); A-400 (at 43:25-44:9); A-482-83.   This procedural
configuration under FRCP 56 required Feil 747 to put on evidence showing a
contrary intent – either iStar testimony that iStar intended some sort of fair market
value repurchase mechanism, or at the very least Feil 747 hearsay that iStar told
Feil 747 that iStar intended some sort of fair market value repurchase mechanism,
as the District Court assumed without record support.   In other words, the District
Court assumed – contrary to the undisputed evidence – that no reasonable contract
parties could have intended the very result these contract parties explicitly intended
and stated they intended in their contract.

## CONCLUSION

The District Court's summary judgment ruling in favor of Feil 747 is
contrary to the plain language of the definitions of "Affiliate" and "Control" set
forth in the Lease, contrary to case law applying these definitions, and contrary to
the undisputed evidence offered by AAR to show the intent and expectations of the
contracting parties.   Accordingly, AAR requests that this Court reverse the
summary judgment in favor of Feil 747 and grant summary judgment in favor of
AAR. *See Building Trades Employers' Educ. Assoc. v. McGowan*, 311 F.3d 501,
508 (2d Cir. 2002) ("We must decide if the district court erred in granting
defendant's motion for summary judgment; if so, we must further consider whether
it was error to deny plaintiffs' motion for the same relief"); *Aircraft Trading and*

*Services, Inc. v. Braniff*, 819 F.2d 1227, 1236 (2d Cir. 1981) (reversing summary judgment entered in favor of defendant and reversing the district court's order denying summary judgment in favor of plaintiff).   In the alternative, AAR requests that this Court reverse the summary judgment entered by the District Court in favor of Feil 747, and remand this action to the District Court for further proceedings.

BAKER & McKENZIE LLP

By:   /s/   Michael A. Pollard
         Michael A. Pollard
         William Lynch Schaller
         John M. Murphy
         Peter P. Tomczak
         Baker & McKenzie LLP
         300 East Randolph Drive
         Chicago, Illinois 60602
         Telephone:  (312) 861-8000
         Facsimile:   (312) 861-2899

         - and -

         John A. Basinger
         Baker & McKenzie LLP
         452 Fifth Avenue
         New York, New York 10018
         Telephone: (212) 626-4463
         Facsimile:  (212) 310-1600

         *Counsel for AAR Allen Services, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,752 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  The brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman style.

Dated:  August 22, 2014                    BAKER & McKENZIE LLP

By:    /s/   Michael A. Pollard
Michael A. Pollard
William Lynch Schaller
John M. Murphy
Peter P. Tomczak
Baker & McKenzie LLP
300 East Randolph Drive
Chicago, Illinois 60602
Telephone:  (312) 861-8000
Facsimile:   (312) 861-2899

- and -

John A. Basinger
Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018
Telephone: (212) 626-4463
Facsimile:  (212) 310-1600

*Counsel for AAR Allen Services, Inc.*

38

# SPECIAL APPENDIX

## TABLE OF CONTENTS TO SPECIAL APPENDIX

| APP NO. | DOCUMENT |
|---------|----------|
| SPA-01 | Opinion and order, Dkt. 38 |
| SPA-11 | Civil Judgment, Dkt. 39 |
| SPA-12 | Attachment 1 – Letter from Clerk to Litigant with attached forms |

SPA-01

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                      :

AAR ALLEN SERVICES INC.,               :
                                        :

                    Plaintiff,        :            13 Civ. 3241 (JMF)
                                        :

                   -v-                :        OPINION AND ORDER
                                        :

FEIL 747 ZECKENDORF BLVD LLC,      :
                                        :

                    Defendant.      :
                                        :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  05/06/2014

JESSE M. FURMAN, United States District Judge:

      AAR Allen Services Inc. (along with its parent company, "AAR") sues Feil 747

Zeckendorf Blvd LLC ("Feil") to enforce the terms of a lease providing AAR with an option to

purchase the property covered by the lease, located at 747 Zeckendorf Boulevard, Garden City,

New York (the "Garden City Property"). The material facts are undisputed; the parties' dispute

centers instead on whether, under the terms of the lease, AAR's right of first refusal to the

purchase the Garden City Property was triggered. For the reasons discussed below, the Court

agrees with Feil that it was not. Accordingly, although only AAR moves for summary judgment

under Rule 56 of the Federal Rules of Civil Procedure, Feil is entitled to judgment as a matter of

law. Thus, summary judgment is granted in Feil's favor, and the Complaint is dismissed.

## BACKGROUND

      The following facts, which are taken from the parties' Local Rule 56.1 Statements of

Material Facts and the evidence they submitted in connection with this motion, are uncontested

except where noted.

## A.    Factual Background

In 1979, AAR purchased the Garden City Property, a nine-acre lot containing a 150,000 square-foot office and testing facility.  (Def. Feil 747 Zeckendorf Blvd LLC's Resp. Pl. AAR Allen Services Inc.'s Local Rule 56.1 Statement Material Facts (Docket No. 35) ("Def.'s 56.1 Resp.") ¶ 1).  AAR uses the facility to maintain and repair aircraft components, which is its primary line of business.  (*Id.* ¶¶ 2-3).  In 2003, AAR sold the Garden City Property to non-party iStar Garden City LLC for $14,800,000.  (*Id.* ¶ 6).  Pursuant to a contemporaneous contract (the "lease agreement"), AAR simultaneously leased back the Garden City Property for a twenty-year term on a "triple-net" basis (that is, where the lessee is legally responsible for paying all expenses associated with the property, including interest, property taxes, insurance, and maintenance costs, *see* Black's Law Dictionary 972, 1646 (9th ed. 2009)).  (*Id.* ¶ 7).  In 2008, iStar Garden City LLC assigned its interest in the lease agreement to Defendant Feil.  (*Id.* ¶ 13).

## B.    The Lease Agreement

Under the terms of the lease agreement, AAR secured the right, if certain conditions were met, to repurchase the Garden City Property after ten years of the twenty-year lease period expired.  That right was established by Paragraph 30 of the lease agreement, which reads, in relevant part, as follows:

> (a) From August 1, 2012 through October 31, 2012 ("ROFR Period") and so long as no Event of Default then exists . . . , Tenant shall have a right of first refusal to purchase the Premises upon the terms and conditions set forth in this paragraph 30.  During the ROFR Period Landlord shall not sell or agree to sell the Premises without first complying with this paragraph 30.

> (b) During the ROFR Period, if Landlord receives an offer to sell the Premises to a Person that is *not a Landlord Affiliate or an Affiliate of Tenant or Guarantor* which Landlord desires to accept, Landlord shall notify ("ROFR Notice") Tenant in writing of such event.  Landlord agrees that if Landlord receives such an offer to sell the Premises during the ROFR period for a purchase price of $16,280,000.00 or greater on an all-cash basis, Landlord shall agree to

2

accept such offer solely for purposes of this paragraph 30 and complying with the provisions of this paragraph 30. The date such notice is given is herein called the "ROFR Notice Date". The ROFR Notice shall state that Landlord intends to sell the Premises to a Person that is not a Landlord Affiliate or an Affiliate of Tenant or Guarantor, for the specified price in such offer ("ROFR Notice Price") on an all-cash basis. Tenant shall have the right, at its option, to make an offer ("Tenant's ROFR Offer") to purchase the Premises in accordance with paragraph 29 on November 1, 2013 (notwithstanding any other proposed closing date in any offer referenced in the ROFR Notice) for the ROFR Notice Price, which offer shall be an all cash offer.

(Pl.'s Local Rule 56.1 Statement Material Facts (Docket No. 28) ("Pl.'s 56.1 Statement"), Ex. 2 ("Lease Agreement") ¶ 30 (emphasis added and emphasis omitted); *see also* Def.'s 56.1 Resp. ¶ 10). In simple terms, the provision created a "right of first refusal" that arose approximately halfway through the duration of the twenty-year lease, but only for three months. Specifically, if Feil received an offer during that window to purchase the property for more than $16,180,000, and if that offer did not come — to the extent relevant here — from an "affiliate" of AAR, then AAR had the option to purchase the property on an all-cash basis for the amount of the offer.

As defined in the lease agreement, "'[a]ffiliates' means Persons (other than individuals), controlled by, controlling, or under common control" with the tenant. (Lease Agreement ¶ 1; Def.'s 56.1 Resp. ¶ 17). "Control," in turn, is defined as "the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, *by contracts or otherwise*." (Lease Agreement ¶ 1 (emphasis added); Def.'s 56.1 Resp. ¶ 19).

## C.    The Alleged Purchase Offer

On January 27, 2012, AAR entered into an agreement with Jones Lang LaSalle — "a financial and professional services firm specializing in commercial real estate services and investment management" — "to provide advisory services" related to AAR's real estate holdings. (Def.'s 56.1 Resp. ¶¶ 14, 21). As part of those advisory services, AAR asked Jones

3

Lang LaSalle to assist it in reacquiring the Garden City Property, and Jones Lang LaSalle agreed to do so.  (*Id.* ¶¶ 22, 24).  In order to ensure that AAR paid the lowest possible price, AAR and Jones Lang LaSalle agreed to have the latter firm offer to purchase the Garden City Property for exactly $16,280,000, the amount specified in Paragraph 30(b) of the lease agreement.  (*Id.* ¶ 25).  AAR agreed to pay Jones Lang LaSalle a $365,000 "advisory fee upon closing" if AAR successfully purchased the property.  (*Id.* ¶ 26; *see also* Pl.'s 56.1 Statement, Ex. 4, at 3).  On August 15, 2012, after obtaining AAR's approval to do so, Jones Lang LaSalle submitted a letter to Feil that purported to be a "Purchase Offer" setting out the "basic terms and conditions under which Jones Lang LaSalle or its assignees . . . would agree to purchase" the Garden City Property for $16,280,000 payable in cash.  (Pl.'s 56.1 Statement, Ex. 5, at 1; Decl. Michael J. Firestone Supp. Def. Feil Zeckendorf Blvd LLC's Mem. Law Opp'n Pl. AAR Allen Services Inc.'s Mot. Summ. J. (Docket No. 33) ("Firestone Decl."), Ex. B ("Rotter Dep."), at 29:9-11, 29:24-30:2; *id.*, Ex. C ("Westwood-Booth Dep."), at 128:12-15; *id.*, Ex. A ("Hara Dep."), at 24:7-10; *id.*, Ex. K).

On August 29, 2012, AAR purported to exercise its right of first refusal to purchase the Garden City Property.  (Pl.'s 56.1 Statement, Ex. 6; *see also* Def.'s 56.1 Resp. ¶ 35).  On September 10, 2012, Feil rejected AAR's purchase offer.  (*Id.*, Ex. 7; *see also* Def.'s 56.1 Resp. ¶ 36).  Interestingly, shortly after Feil rejected the purported purchase offer, Jones Lang LaSalle devised a "script" for a key AAR executive to follow when speaking with representatives of Feil. (Firestone Decl., Ex. M; *accord* Pl.'s Resp. Def.'s Local Rule 56.1 Statement Add'l Material Facts ("Pl.'s 56.1 Resp.") (Docket No. 37-1) ¶ 48).  The script suggested that AAR falsely represent that it was not involved in, or even aware of, Jones Lang LaSalle's purchase offer — specifically, that AAR learned of the purchase offer only because Jones Lang LaSalle had

4

contacted AAR about the latter "surrendering its leasehold." (Firestone Decl., Ex. M). The script also recommended that AAR "steer clear of" mentioning "[t]he meaning of control in the document" or "[t]he meaning of affiliate in the document." (*Id.*). AAR does not dispute that Jones Lang LaSalle sent the script or that it received the script, but it submits evidence tending to show that it did not discuss or rely on the Jones Lang LaSalle script. (Pl.'s 56.1 Resp. ¶ 48).

## LEGAL STANDARD

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). An issue of fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). To avoid summary judgment, a party must advance more than a "scintilla of evidence," *Anderson,* 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091 (2d Cir. 1993).

It is well established that, in considering a motion for summary judgment, a court may grant summary judgment in favor of the non-moving party even without a formal cross-motion if "there are no genuine issues of material fact" and "the law is on the side of the non-moving party." *Orix Credit Alliance, Inc. v. Horten*, 965 F. Supp. 481, 484 (S.D.N.Y. 1997). "Summary judgment may be granted to the non-moving party in such circumstances so long as the moving

party has had an adequate opportunity to come forward with all of its evidence." *Id.* "Notice to

the moving party of the intention to grant summary judgment in favor of the non-moving party is

not required . . . where summary judgment is granted to the non-moving party on an issue which

has been fully raised by the moving party." *Id.* (citing *Coach Leatherware Co. v. AnnTaylor,*

*Inc.*, 933 F.2d 162, 167 (2d Cir. 1991); *see also Prudential Sec. Inc. v. Norcom Dev., Inc.*, No. 97

Civ. 6308 (DC), 1999 WL 294806, at *2 n.2 (S.D.N.Y. May 11, 1999).

## DISCUSSION

The parties' dispute turns on whether Jones Lang LaSalle qualifies as an "affiliate" of

AAR for purposes of Paragraph 30.[1]  If it does, then AAR's right of first refusal was not

triggered because the conditions precedent to that right were not met; if it does not (and the other

requirements set forth in Paragraph 30 were met), then AAR's right of first refusal was triggered,

and Feil was obligated to sell the Garden City Property to AAR for the offered price.  Naturally,

Defendant argues that Jones Lang LaSalle was an "affiliate" of AAR on the alternative grounds

that Jones Lang LaSalle was either an agent of AAR (Def. Feil 747 Zeckendorf Blvd LLC's

Mem. Law Opp'n Pl. AAR Allen Services Inc.'s Mot. Summ. J. ("Def.'s Mem.") (Docket No.

31) 14 n.6) or controlled by AAR through the January 27, 2012 contract (*id.* 13-16).  By contrast,

Plaintiff argues that Jones Lang LaSalle was neither controlled by, nor an agent of, AAR (Pl.'s

Mem. Supp. Rule 56 Mot. Summ. J. ("Pl.'s Mem.") (Docket No. 27) 2-4).

The analysis begins with the text of the contract because, under New York law (which the

parties agree governs the lease agreement), "a court must give full effect to unambiguous

---

[1]      The parties also dispute whether the August 14, 2012 letter from Jones Lang LaSalle to
Feil constituted a purchase offer within the meaning of Paragraph 30.  (*Compare* Def.'s Mem.
18-21 *with* Pl.'s Mem. 7-9).  Although AAR makes a forceful argument that it did, the Court
need not reach the issue because, even if the letter did constitute a purchase offer, it did not
trigger the right of first refusal for the reasons set forth below.

contract terms." *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir.

2012). That is, neither extrinsic evidence nor the parties' subjective intent operates to vary the

terms of an unambiguous contract. *Id.* Moreover, it is a well-established principle of New York

contract law that "[a] contract should not be interpreted to produce a result that is

absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties."

*In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (internal citations omitted).

Put slightly differently, "the meaning of particular language found in [a contract] should be

examined 'in light of the business purposes sought to be achieved by the parties and the plain

meaning of the words chosen by them to effect those purposes.'" *Newmont Mines Ltd. v.

Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (quoting *Champion Int'l Corp. v.

Continental Cas. Co.*, 546 F.2d 502, 505 (2d Cir. 1976)). Finally, "[w]hether contract language

is ambiguous is a question of law that is resolved by reference to the contract alone." *O'Neil v.

Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994) (internal

quotation marks omitted).

　　　　Applying those principles to the undisputed facts of this case, the Court concludes that

Jones Lang LaSalle was an "affiliate" of AAR. Paragraph 30 of the lease agreement, along with

its related definitions, was plainly drafted to prevent just the sort of gamesmanship AAR

attempted in this case. Indeed, the obvious reason to include such a clause in a long-term lease

agreement is to prevent one counterparty from making a straw-man offer and effectively holding

a call option on the property at a below-market price. Consistent with that interpretation, the

lease agreement defines "affiliate" in capacious terms: party A is an affiliate of party B if it has

"the power to direct or cause the direction of the management and policies of [party B], whether

through the ownership of voting securities, *by contracts or otherwise*." (Lease Agreement ¶ 1

(emphasis added)).  The January 27, 2012 side-agreement between AAR and Jones Lang LaSalle

gave AAR that measure of control because it effectively required Jones Lang LaSalle to do

exactly what AAR wanted it to do: namely, make a purchase offer for the Garden City Property.

That this measure of control came through positive rather than negative reinforcement — *i.e.*, a

benefit for complying rather than a punishment for breach — is irrelevant for purposes of the

lease agreement, which also includes as "affiliates" entities "control[led] . . . otherwise."  (*Id.*).[2]

    This conclusion is consistent with case law interpreting similar contracts.  In *Telenor*

*Mobile Communications AS v. Storm LLC*, 587 F. Supp. 2d 594, 605 (S.D.N.Y. 2008), the court

interpreted a similar "control" provision broadly and noted that "[c]ontractual arrangements,

such as . . . agency or other commercial contracts, can allow one entity to wield significant

power over another."  Such was the case here: Jones Lang LaSalle had only to submit a purchase

offer for the Garden City Property in order to collect $360,000.  Jones Lang LaSalle effectively

bore no risk in the transaction whatsoever.[3]  Thus, the Court concludes that Jones Lang LaSalle

---

[2]    Plaintiff relies on *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976), for the proposition that "[c]ontrol . . . means the ability to participate in the day-to-day affairs of the corporations or to direct the corporation's officers in setting corporate policies."  (Pl.'s Reply Mem. Supp. Rule 56 Mot. Summ. J. (Docket No. 37) 3).  But *Corr* itself demonstrates that the concept of control "is not a narrow one."  543 F.2d at 1050.  Moreover, in the context of commercial agreements — as opposed to the related but conceptually distinct statutory context of securities fraud — "control" has been interpreted even more broadly.  *See, e.g.*, *Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp. 2d 594, 606 (S.D.N.Y. 2008) (interpreting "control," in the context of a nearly identical provision, to prohibit one corporation from using contracts to render another corporation "its puppet").

[3]    Indeed, although the fact is legally irrelevant in light of the lease agreement's unambiguity, and although Plaintiff disputes the characterization, Jones Lang LaSalle officers testified that they understood that AAR — not Jones Lang LaSalle — would be purchasing the property.  (*See* Local Rule 56.1 Statement Add'l Material Facts Supp. Def. Feil 747 Zeckendorf Blvd LLC's Mem. Law Opp'n Pl. AAR Allen Services Inc.'s Mot. Summ. J. (Docket No. 32) ("Def.'s 56.1 Statement") ¶ 21; *see also* Rotter Dep., at 33:20-23).  In fact, Jones Lang LaSalle Managing Director Bruce Westwood-Booth testified that Jones Lang LaSalle was acting as a "straw man . . . on AAR's behalf."  (Firestone Decl., Ex. G; *cf.* Pl.'s 56.1 Resp. ¶ 19 ("Mr. Westwood-Both [sic] testified that by 'straw man,' he meant that Jones Lang LaSalle was acting

SPA-09

was, for purposes of the lease agreement, AAR's affiliate — either by contract or, in the alternative, "otherwise." Accordingly, the contract's terms are unambiguous and support Defendant's interpretation, and, as a result, Defendant is entitled to judgment as a matter of law.

Even if the lease agreement's plain language were initially ambiguous, longstanding principles of contract interpretation would call for the same result. Under the "four-corners rule," facially ambiguous contracts can be found unambiguous as a matter of law where there is only one "practical interpretation to the language employed and the parties' reasonable expectations." *Berkshire Bank v. Tedeschi*, No 11 Civ. 767 (LEK/CFH), 2013 WL 1291851, at *8 (N.D.N.Y. Mar. 27, 2013) (internal quotation marks omitted). Moreover, it is black-letter contract law that "a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided." *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 943 N.Y.S.2d 493, 498 (1st Dep't 2012). Here, Plaintiff's preferred reading would indeed give it an unfair advantage, as it would effectively allow Plaintiff to employ trickery and deceit to obtain a result for which it did not bargain in the first instance. The world of complex commercial transactions, like politics, may not be "beanbag," *see, e.g.*, *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1219 & n.2 (10th Cir. 2008) (attributing the aphorism "Politics ain't beanbag" to Chicago humorist Finley Peter Dunne) — but neither is it Three-Card Monte.

## CONCLUSION

For the reasons stated above, the Court concludes that the lease agreement is unambiguous and that Jones Lang LaSalle was an "affiliate" within the meaning of Paragraph

---

as AAR's 'facilitator.'")). Adding credibility to those understandings is the fact that Jones Lang LaSalle never sought internal approval to allocate funds to purchase the Garden City Property. (Def.'s 56.1 Statement ¶ 22; *see also id.*, Ex. C, at 112:21-113:6).

SPA-10

30.  Accordingly, although Defendant has not moved for summary judgment, the Court

nevertheless grants it such relief, as Plaintiff "has had an adequate opportunity to come forward

with all of its evidence," *Orix Credit Alliance*, 965 F. Supp. at 484, and the undisputed evidence

reveals that Defendant is entitled to judgment as a matter of law.

The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: May 6, 2014
New York, New York

_____
JESSE M. FURMAN
United States District Judge

SPA-11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
AAR Allen Services Inc.,

                         Plaintiff,                 **13 CIVIL** 3241 (JMF)

           -against-                   **JUDGMENT**

FEIL 747 Zeckendorf Blvd LLC,

                       Defendant.
-----------------------------------------------------------X

      Plaintiff having moved for summary judgment pursuant to Fed. R. Civ. P. 56, and the matter having come before the Honorable Jesse M. Furman, United States District Judge, and the Court, on May 6, 2014, having rendered its Opinion and Order (Doc. #38)  denying Plaintiff's motion for summary judgment, and although the Defendant has not moved for summary judgment, the Court nevertheless is granting it such relief, as Plaintiff "has had an adequate opportunity to come forward with all of its evidence,"and revealing the undisputed evidence that the Defendant is entitled to judgment as a matter of law and directing the Clerk of Court to close the case, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated May 6, 2014, Plaintiff's  motion for summary judgment is denied and although the Defendant has not moved for summary judgment, the Court nevertheless grants it such relief, as Plaintiff "has had an adequate opportunity to come forward with all of its evidence," Orix Credit Alliance, 965 F. Supp. at 484, and the undisputed evidence reveals that the Defendant is entitled to judgment as a matter of law; accordingly, the case is closed.

**Dated:**  New York, New York
          May 7, 2014

                                     **RUBY J. KRAJICK**

                                     _____

                                     **Clerk of Court**

                  **BY:**

                                     _____

                                     **Deputy Clerk**

SPA-12



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by credit card, or by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 12/23/13

SPA-13

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the ☐ judgment ☐ order entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

| | |
|---|---|
| _____ | _____ |
| Dated | Signature[*] |
| _____ | |
| Name (Last, First, MI) | |

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Address | City | State | Zip Code |

| | |
|---|---|
| _____ | _____ |
| Telephone Number | E-mail Address (if available) |

_____

[*] Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

SPA-14

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

**MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time to file a notice of appeal in this action. I would like to appeal the judgment entered in this action on _____ but did not file a notice of appearance within the required

date

time period because:

_____

_____

_____

(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

_____        _____
Dated:                                Signature

_____
Name (Last, First, MI)

_____
Address            City            State            Zip Code

_____        _____
Telephone Number                     E-mail Address (if available)

Rev. 12/23/13

SPA-15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____        _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                      **MOTION FOR LEAVE TO
                               PROCEED IN FORMA
                               PAUPERIS ON APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.


_____        _____
Dated                                   Signature

                                        _____
                                        Name (Last, First, MI)

_____
Address                    City          State              Zip Code

_____        _____
Telephone Number                        E-mail Address (if available)

Rev. 12/23/13

SPA-16

## Application to Appeal In Forma Pauperis

_____**v.** _____     Appeal No. _____

District Court or Agency No. _____

| **Affidavit in Support of Motion** | **Instructions** |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.    *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| **Income source** | **Average monthly amount during the past 12 months** | | **Amount expected next month** | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

12/01/2013 SCC

SPA-17

| Interest and dividends | $ | $ | $ | $ |
|---|---|---|---|---|
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | **$** | **$** | **$** | **$** |

2.      *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.      *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

- 2 -

SPA-18

4.    *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.    *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
|  |  | Make and year: |
|  |  | Model: |
|  |  | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: |  |  |
| Model: |  |  |
| Registration #: |  |  |

SPA-19

6.     *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |

7.     *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.     *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

|  | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>        Are real estate taxes included?        [  ] Yes  [  ] No<br>        Is property insurance included?        [  ] Yes  [  ] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

SPA-20

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| Homeowner's or renter's: | $ | $ |
| Life: | $ | $ |
| Health: | $ | $ |
| Motor vehicle: | $ | $ |
| Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
| Motor Vehicle: | $ | $ |
| Credit card (name): | $ | $ |
| Department store (name): | $ | $ |
| Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | **$** | **$** |

9.      *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

[  ] Yes        [  ] No        If yes, describe on an attached sheet.

10.     *Have you spent — or will you be spending — any money for expenses or attorney fees in connection with this lawsuit?* [  ] Yes [  ] No

*If yes, how much?* $ _____

- 5 -

SPA-21

11.     *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.     *Identify the city and state of your legal residence.*

City _____    State _____

Your daytime phone number: _____

Your age: _____    Your years of schooling: _____

Last four digits of your social-security number:  _____