# 14-1877-cv

## United States Court of Appeals

*for the*

## Second Circuit

AAR ALLEN SERVICES INC.,

*Plaintiff-Appellant,*

– v. –

FEIL 747 ZECKENDORF BLVD LLC,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

DAVID J. NATHAN
STEVEN I. LEVIN
MICHAEL J. FIRESTONE
LEVIN & GLASSER, P.C.
*Attorneys for Defendant-Appellee*
420 Lexington Avenue, Suite 2818
New York, New York 10170
(212) 867-3636

## **CORPORATE DISCLOSURE STATEMENT**

Defendant-Appellee Feil 747 Zeckendorf Blvd LLC has no parent corporation and no publicly held corporation is the owner of 10% or more of Feil 747.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………….…..................... ii

COUNTER-STATEMENT OF ISSUES…………………………………….. 1

COUNTER-STATEMENT OF THE CASE…………………………...…..... 2

   A. PRELIMINARY STATEMENT……………………………………… 2

   B. COUNTER-STATEMENT OF FACTS……………………………… 5
     1. The Right of First Refusal Provision …………………………... 5
     2. Feil 747 Purchases the Garden City Property……………………... 7
     3. Jones Lang Devises a Plan to Trigger the ROFR………………… 8
     4. AAR Directs Jones Lang to Send Feil 747 an
       "Offer" to Purchase the Garden City Property ………………….... 9
     5. AAR and Jones Lang Amend the Agency Agreement…………… 11
     6. Jones Lang Submits a "Purchase Offer" Letter to Feil 747........... 12
     7. AAR and Jones Lang Hide their Relationship from Feil 747…... . 13

SUMMARY OF ARGUMENT……………………………………… ………. 15

ARGUMENT……………………………………………………. ……... 16

   I.   JONES LANG IS AN AFFILIATE OF AAR UNDER
       THE LEASE…………………………………………………….. 16
   II.   THE ROFR WAS NOT TRIGGERED BECAUSE
       JONES LANG'S ACTS ARE IMPUTED TO AAR ………………... 24
   III.   JONES LANG'S "OFFER " DID NOT TRIGGER THE
       ROFR BECAUSE IT WAS NOT GENUINE……………………… 26

CONCLUSION……………………………………………………… 28

# TABLE OF AUTHORITIES

## Cases

*Burzynski v. Travers*,
   636 F. Supp. 109 (E.D.N.Y. 1986) ………………………………..   26

*Compudyne Corp. v. Shane*,
   453 F. Supp.2d 807 (S.D.N.Y. 2006) ……....………………….....   21

*County of Suffolk v. Alcorn*,
   266 F.3d 131, 138 (2d Cir. 2001)…………………………………....   19

*Farrago Adv., Inc. v. Hollinger Int'l, Inc.*,
   157 F. Supp.2d 252 (S.D.N.Y. 2001) ……………………….…   26

*Goldberg & Connolly v. New York Bancorp, Inc.*,
   565 F.3d 66, 72 (2d Cir. 2009)……………………………………   19

*Greenwich Capital Financial Prods. Inc. v. Negrin*,
   74 A.D.3d 413 (1st Dep't 2010) ……………………….........   27

*Holmes v. Lorch*,
   329 F. Supp.2d 516 (S.D.N.Y. 2004) …………………………   25

*Kirschner v. KPMG LLP*,
   15 N.Y.3d 446 (2010) …………………………. ………………   25

*Laperriere v. Vesta Ins. Group, Inc.*,
   526 F.3d 715 (4th Cir. 2008) ..…………………………………...   21

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
   1 A.D.3d 170 (1st Dep't 2003) …………………………………..   22-23, 27

*Madison Avenue Leasehold, LLC v. Madison Bentley Assoc., LLC*,
   30 A.D.3d 1(1st Dep't 2006) ……………………………………..   21-22

*Matter of Wallace v. 600 Partners Co.*,
   86 N.Y.2d 543 (1995) ………...........................................   24

*Maxwell Newspapers, Inc.*,
    151 B.R. 63 (Bankr. S.D.N.Y. 1993) …………………………….    25

*Old Republic Ins. Co. v. Hansa World Cargo Services, Inc.*,
    51 F. Supp.2d 457 (S.D.N.Y. 1999) …………………………….    25

*Olin Corp. v. American Home Assurance Co.*,
    704 F.3d 89 (2d Cir. 2012) …………………………………….    22

*Paracor Finance, Inc. v. General Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ………………………………..    20

*Telenor Mobile Communications v. Storm LLC*,
    587 F. Supp.2d 594 (S.D.N.Y. 2008)……..…………………….    19, 21

*Quigley v. Capolongo*,
    53 A.D.2d 714 (3d Dep't 1976) …………………………......    26

*Race v. Goldstar Jewellry, LLC*,
    84 A.D.3d 134 (2d Dep't 2011) …………………………......    19

*Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (1st Dep't 2008)…………………………………    20

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) …………………………………………    24

*Waldman v. Reidinger*,
    423 F.3d 145 (2d Cir. 2009)……………………………………    21

## **Statutes and Rules**

17 C.F.R. § 230.405……………………………………………..    18

17 C.F.R. § 240.12b-2…………………………………………...    18

## <u>COUNTER-STATEMENT OF ISSUES</u>

1.      Did the District Court (Furman, J.) properly grant summary judgment to Defendant-Appellee Feil 747 Zeckendorf Blvd LLC ("Feil 747") on the grounds that the management and policies of Jones Lang LaSalle ("Jones Lang") were directed by Plaintiff-Appellant AAR Allen Services, Inc. ("AAR"), thus making them "Affiliates" under the governing lease (the "Lease")?

2.      Although argued by Feil 747 below but not reached by the District Court, could the District Court have also granted summary judgment to Feil 747 on the alternative grounds that: (i) as AAR's agent, Jones Lang's actions are imputed to AAR and therefore could not trigger the right of first refusal, and/or (ii) Jones Lang's "offer" was a sham, and only a *bona fide* offer could trigger the right of first refusal under the Lease?

# COUNTER-STATEMENT OF THE CASE

## A.    PRELIMINARY STATEMENT

The District Court correctly held that a right of first refusal relating to a property that AAR leases from Feil 747 was not triggered when AAR directed its agent to make a sham offer to purchase the property.

In 2008, Feil 747 purchased property located in Garden City, New York (the "Garden City Property"), and the existing Lease which governed AAR's tenancy at the Garden City Property was assigned by the property's then-owner to Feil 747. Under the Lease, AAR had a right of first refusal to match offers made between August 1, 2012 and October 31, 2012 by a non-affiliate of AAR or Feil 747, provided the offer was for at least $16.28 million. The Lease defines "Affiliate" as any entity whose "management and policies" can be directed by AAR or Feil 747. Here, AAR entered into a written agency agreement with Jones Lang, a real estate services firm, to act as AAR's agent and submit an "offer" to purchase the Garden City Property solely for the purpose of triggering the right of first refusal. Pursuant to the agency agreement, Jones Lang's "offer" to purchase the Garden City Property (including the price and all other material terms), was entirely directed and controlled by AAR. Jones Lang, which considered itself AAR's "straw man," acknowledged that it would not have made any "offer" without being directed to do so by AAR, adopted each of AAR's changes to the material terms of its letter to

2

Feil 747 purporting to offer to purchase the Garden City Property, and had no intention of ever taking title to the Garden City Property.

AAR argues that the phrase "management and policies" should be read so narrowly that it does not apply to an individual transaction (*e.g.*, Jones Lang's actions as AAR's "straw man"), but rather only to circumstances where one entity controls all management decisions in every aspect of another entity's existence, and that Jones Lang is therefore not an "Affiliate" under the Lease. In support, AAR cites to the definition of "management and policies" under the federal securities laws. There, "management and policies" is narrowly interpreted in order to limit the circumstances under which secondary liability for securities fraud can be imposed on a "control" person. Here, there is no comparable concern (no criminal or civil penalties under federal law are implicated) and the phrase should be given its ordinary and broad meaning.

Moreover, to interpret the Lease as proposed by AAR would render the contractual right of first refusal meaningless and instead, as the District Court put it, grant AAR a "call option on the property at a below-market price." SPA-07.[1] The Lease, however, provided AAR with a limited right of first refusal that could only be triggered by an offer from an unaffiliated third party, *not* an unqualified call option. Indeed, AAR's president testified, and AAR concedes in its opening

---

[1] References to "SPA-__" are to the Special Appendix attached to AAR's brief in support of its appeal.

3

brief on appeal, that the Lease provision at issue was carefully drafted so that it could *not* be construed as an option. AAR feared that if the Lease could be so construed, AAR would be in violation of its lender covenants.

Furthermore, the only commercially reasonable interpretation of the Lease requires that a *bona fide* offer be made in order to trigger the right of first refusal. Were the Lease to allow a "straw man" to trigger the right of first refusal with a sham offer as AAR suggests, nothing would stop Feil 747 from using its own straw man to submit a sham offer at an inflated price, leaving AAR with only a prohibitively inflated offer to match. The notion that the Lease contemplates such a result – the parties each hiring undisclosed agents and submitting sham offers during a three-month period to trigger and then defeat a right of first refusal – is nonsensical.

In short, having drafted and signed a lease containing a right of first refusal, AAR may not, through what the District Court characterized as "trickery and deceit" (SPA-09), convert that right of first refusal into something it is not.

Feil 747, which purchased the Garden City Property and was assigned the Lease, was not privy to any of the purported meanings that AAR argues ten years later were intended. Feil 747 was and is entitled to rely on the language of the Lease which provides a right of first refusal, not an option.

Although the District Court did not (as it had no need to) reach the issue of agency, it is uncontested that Jones Lang acted as AAR's agent and was bound by a written agency agreement to act entirely and exclusively on AAR's behalf. The acts of an agent are deemed to be the acts of the principal. Thus, Jones Lang's so-called "offer" is imputed to AAR. Consequently, there was no third-party offer triggering the right of first refusal under the Lease, and no offer for AAR to match.

**B.     COUNTER-STATEMENT OF FACTS**

**1.     The Right of First Refusal Provision**

In October 2003, AAR entered into a "sale/leaseback" transaction with iStar Financial Inc. ("iStar"), whereby iStar purchased the Garden City Property from AAR and then leased it back to AAR under the terms of the Lease dated October 3, 2002. *See* A-114.[2] The Lease granted AAR a right of first refusal (the "ROFR") which could be exercised only if an offer in the amount of $16.28 million or greater was made between August 1, 2012 and October 31, 2012 by a non-"Affiliate" of AAR or the owner (originally iStar and now Feil 747). *See* A-72-73. Paragraph 30 of the Lease, which is titled "Right of First Refusal," states in relevant part as follows:

> (a)     From August 1, 2012 through October 31, 2012 (the "ROFR Period") . . . ***Tenant shall have a right of first refusal to purchase the premises upon the terms and conditions set***

---

[2] References to "A-__" are to those materials contained in the parties' Joint Appendix.

5

> ***forth in this paragraph 30.*** During the ROFR Period
> Landlord shall not sell or agree to sell the Premises without
> first complying with this paragraph 30.
>
> (b) . . . Landlord agrees that if Landlord receives such an
> offer to sell the Premises during the ROFR Period for a
> purchase price of $16,280,000 or greater on an all cash basis,
> Landlord shall agree to accept such offer solely for purposes of
> this paragraph 30 and complying with the provisions of this
> paragraph 30. The date such notice is given is the "ROFR
> Notice Date". The ROFR Notice shall state that Landlord
> intends to sell the Premises to a Person that is not a Landlord
> Affiliate or an Affiliate of Tenant or Guarantor for the
> specified price in such offer ("ROFR Notice Price") on an all-
> cash basis. Tenant shall have the right, at its option, to make
> an offer ("Tenant's ROFR Offer") to purchase the Premises in
> accordance with Paragraph 29 on November 1, 2013,
> (notwithstanding any other proposed closing date in any offer
> referenced in the ROFR Notice) for the ROFR Notice Price,
> which offer shall be an all cash offer.

*Id.* (emphasis supplied). The Lease defines the term "Affiliates" as "Persons

(other than individuals) controlled by, controlling, or under common control with

Tenant or Guarantor." A-26. "Control" is defined in the Lease as "the possession

directly or indirectly of the ***power to direct or cause the direction of the***

***management and policies of a Person***, whether through the ownership of voting

securities, ***by contracts or otherwise***." A-27 (emphasis supplied).

Mr. Timothy Romenesko, AAR's president who negotiated the Lease on

AAR's behalf, testified that the Lease was carefully drafted to prevent it from

being construed as granting AAR an option to purchase the Garden City

Property.[3]  *See* A-392 (11:23-12:23); *see also* Brief of AAR ("Br.") at 9-10.  AAR

was concerned that if the Lease granted AAR an option to purchase the Garden

City Property, it would need to be maintained on AAR's balance sheet as an asset

and AAR's lenders would view the transaction as a "financing" in violation of

AAR's lender covenants.  *See id.*; A-393 (15:1-9).  As Mr. Romenesko testified,

AAR "wanted to have certainty that there wasn't some kind of rule change that

would cause this transaction to go on the balance sheet and . . . have an

opportunity for the banks to say 'No, that's not a sale leaseback, it's really a

financing . . . .'" *Id.*

### 2.     <u>Feil 747 Purchases the Garden City Property</u>

In 2008, Feil 747 purchased the Garden City Property from iStar and the

Lease was assigned to Feil 747.  *See* A-115.  AAR presently leases the Garden

City Property from Feil 747 pursuant to the Lease.  *See* A-478.

---

[3] AAR sought and received permission from the District Court to file its motion for summary judgment on September 13, 2013 prior to any discovery taking place in this action (*see* A-108-A-110), and AAR took no discovery in this action from Feil 747 or iStar.  *See id*.  The District Court permitted Feil 747 to take limited fact discovery, which included the depositions of four individuals in connection with this litigation: Doug Hara, AAR's Director of Real Estate; Steven Rotter, Managing Director at Jones Lang; Bruce Westwood-Booth, Managing Director at Jones Lang; and Timothy Romenesko, President and Chief Operating Officer of AAR.  Both Messrs. Westwood-Booth and Romenesko testified on behalf of Jones Lang and AAR, respectively, pursuant to Fed. R. Civ. P. 30(b)(6).  The transcripts of these four depositions are included in the Joint Appendix.  *See* A-258-435.

### 3. Jones Lang Devises a Plan to Trigger the ROFR

On April 25, 2012, with the period in which the ROFR could be triggered approaching, Doug Hara, AAR's Director of Real Estate, contacted Jones Lang, a real estate services firm, and informed Jones Lang that "AAR wants to purchase the Garden City property" pursuant to the ROFR Provision. *See* A-437; A-324 (11:6-24). AAR and Jones Lang had previously entered into an "Exclusive Agency Agreement" (the "Agency Agreement"), pursuant to which Jones Lang agreed that, at AAR's request, it would provide various real estate services on AAR's behalf. *See* A-211-220; *see also* A-260-261 (19:15-10:17).

On April 27, 2012, two days after Mr. Hara contacted Jones Lang and advised it that AAR wanted to purchase the Garden City Property, Bruce Westwood-Booth, a Managing Director in Jones Lang's Chicago office, prepared a single-page chart describing potential tactics for triggering the ROFR. *See* A-439-440; *see also* A-332 (45:16-21). Specifically, Jones Lang would submit a "letter of intent" to Feil 747 indicating its willingness to purchase the Garden City Property for an amount greater than "$16.1 million" [sic], and either (i) AAR would purchase the Garden City Property by exercising the ROFR, or (ii) Feil 747 and Jones Lang would proceed to negotiate a purchase and sale agreement (the "PSA") for the Garden City Property, and Jones Lang would assign its rights under the PSA to AAR. *See* A-440; *see also* A-334-335 (53:12-54:24). As Mr.

Westwood-Booth testified, Jones Lang never had any expectation of taking title to the property – rather, AAR would purchase it. *See* A-336 (58:19-20); A-333 (47:22-25); s*ee also* A-308 (33:20-23). As a result, Jones Lang never sought internal approval to use Jones Lang funds to purchase the Garden City Property, which would have been necessary were Jones Lang to commit to purchasing the property for its own account. *See* A-349 (112:16-113:25). Indeed, as Jones Lang described itself in written correspondence, Jones Lang was acting as AAR's "straw man." A-442.

### 4. AAR Directs Jones Lang to Send Feil 747 an <u>"Offer" to Purchase the Garden City Property</u>

At a meeting in early August 2012 attended by AAR's senior officers, AAR made a "final decision" to attempt to trigger the ROFR. *See* A-406 (67:8-13). AAR believed that the Garden City Property was worth "in the range of $18 million" – *i.e*., in excess of the $16,280,000 it intended to pay Feil 747 if it could trigger the ROFR. A-394 (19:25-20:5). Based upon AAR's and Jones Lang's agreed plan, Robert Regan, AAR's General Counsel, directed Jones Lang to prepare to send to Feil 747 an offer to purchase the Garden City Property. *See* A-406 (68:18-22).

On August 6, 2012, Jones Lang sent Mr. Hara (AAR's Director of Real Estate) a draft letter to be sent to Feil 747 purporting to set forth the terms and conditions under which Jones Lang would "purchase" the Garden City Property.

9

*See* A-445-449.   On August 10, 2012, Mr. Hara sent Jones Lang a handwritten mark-up of the draft letter containing both his comments as well as those of AAR's general counsel, Mr. Regan.  *See* A-451-454; A-277-278 (78:2-21; 79:2-8); A-518 (¶ 29).  Mr. Regan (i) deleted a confidentiality provision; (ii) inserted language requiring that Feil 747 not negotiate a sale of the Garden City Property with any other party, "subject to its obligations under the lease agreement with AAR"; and (iii) requested that Jones Lang "discuss" with AAR the proposed closing date of November 1, 2013.  Mr. Hara circled the $16,300,000 "purchase price" and wrote "16,280,000[,] what does lease say?"  *See* A-451-454; A-518 (¶ 30).  Mr. Hara admits that he did this because he "thought that Jones Lang should offer the $16,280[,000] instead of $16,300[,000]."  A-278 (80:10-13).  A subsequent version of the letter (as well as the final version sent to Feil 747) reflected each of AAR's directions.  Jones Lang deleted the confidentiality provision, inserted the language supplied by Mr. Regan with respect to Feil 747's obligations under the Lease, changed the purchase price to $16,280,000, and replaced the old closing date of November 1, 2013 with a new closing date of December 31, 2012.  *See* A-456-464; A-226-229.

On or about August 14, 2012, AAR approved Jones Lang's letter to Feil 747.  *See* A-279 (83:4-9).  As Mr. Westwood-Booth testified, Jones Lang would not and did not send the letter until receiving AAR's approval and knowing that

10

AAR was "comfortable with the letter and the content." A-355 (136:23-25); *see also* A-345 (94:19-22); A-339 (71:21-24; 72:9-12; 73:3-5).

### 5. AAR and Jones Lang Amend the Agency Agreement

On the same day that the letter was approved by AAR, Jones Lang and AAR executed a First Amendment to the Agency Agreement (the "Amendment"), pursuant to which Jones Lang agreed to assist AAR "in acquir[ing] the Garden City Property . . . for the lowest possible price" and to "[f]acilitate [the] Right of First Refusal per Article 29 and Article 30 of AAR's existing lease at the Property." A-222-224; A-127 (¶ 25). In return for providing these services, Jones Lang would receive a success fee of $365,000, but only if AAR purchased the Garden City Property.[4] *See* A-224.

According to Mr. Westwood-Booth (Managing Director at Jones Lang), Jones Lang was "not going to submit an offer [to purchase the Garden City Property] unless . . . [it] had an agreement in place with AAR." A-339 (73:17-18). Both Jones Lang and AAR understood when they executed the Amendment that Jones Lang would only submit a purchase offer to Feil 747 pursuant to its

---

[4] AAR claims that "the risk" that Jones Lang might have to purchase the Garden City Property "justified" the $365,000 fee. Br. at 14, citing testimony of Mr. Romenesko. (There is no similar testimony from Jones Lang itself.) Based on the language of Jones Lang's letter "offering" to purchase the Garden City Property, there are *no* circumstances under which Jones Lang actually would have had to purchase the Garden City Property. *See infra* 12-13. There was no risk; the fee was simply to compensate Jones Lang as AAR's straw man for its assistance if the scheme devised by AAR and Jones Lang was successful.

11

contractual obligation under the Amendment. *See* A-403 (55:13-20); A-397
(33:16-17); A-338 (66:16-67:3. 12-15). As Mr. Romenesko testified, AAR
"specifically engaged" Jones Lang to submit the purchase offer to Feil 747. A-
401 (49:21-25). Jones Lang understood that "sending the . . . letter . . . [was] part
of the services . . . provided under" the Amendment. A-353 (128:12-15). Mr.
Westwood-Booth could not "envision a situation" in which Jones Lang would do
"anything that . . . wasn't consistent with . . . [its] agreements with AAR" to assist
AAR in acquiring the Garden City Property. A-347 (102:20-23).

### 6. Jones Lang Submits a "Purchase Offer" Letter to Feil 747

On August 15, 2012, at AAR's direction and pursuant to the Agency
Agreement (as amended), Steven Rotter, a Managing Director in Jones Lang's
New York office, signed Jones Lang's "offer" letter and sent it to Jeffrey Feil, the
managing member of Feil 747. *See* A-466-470; *see also* A-339 (73:3-11); A-307-
308 (29:24-30:1); A-264 (24:7-10); A-478. The letter purported to include "the
basic terms and conditions under which Jones Lang LaSalle or its assignees
('Purchasers') would agree to purchase the" Garden City Property. *See* A-467.

In its letter, Jones Lang stated explicitly that its "offer" was "not binding on
either party until made part of a mutually executed PSA [*i.e.*, purchase and sale
agreement]," and that the letter was "not intended to constitute an agreement to
execute the PSA . . . or for the Purchaser to negotiate a purchase of the Properties

12

from the owner(s). . . ." A-469. Moreover, the letter stated "that neither Purchaser nor Seller will be legally bound in any manner unless and until the PSA has been prepared, executed and delivered by both Purchaser and Seller." *Id.* At the end of the letter, Jones Lang inserted a signature block under the words "Agreed and Accepted." A-470.

On August 16, 2012, Mr. Feil informed Mr. Rotter that the Garden City Property was "not for sale." A-474.

### 7. <u>AAR and Jones Lang Hide their Relationship from Feil 747</u>

At the time that Jones Lang made its "offer," neither AAR nor Jones Lang disclosed to Feil 747 that AAR had specifically engaged Jones Lang to offer to purchase the Garden City Property, or that Jones Lang had sent its "offer" to Feil 747 pursuant to a written agency agreement. *See* A-479. To the contrary, Mr. Westwood-Booth of Jones Lang advised Mr. Hara on August 23, 2012 that if he spoke with Mr. Feil, Feil 747's managing member, he should state that AAR had fortuitously learned of Jones Lang's offer *after* being contacted by Jones Lang and told that Jones Lang's New York office had submitted an offer to purchase the Garden City Property. A-477.

Mr. Westwood-Booth of Jones Lang also advised Mr. Hara to "**stay away** from" the meaning of the words "Control" and "Affiliate" in the Lease because if in his discussions with Mr. Feil, Mr. Hara "decided to give his interpretation of

13

what control and affiliate was . . . that would not be a good event." *Id.* (emphasis in original); A-357 (145:5-8).  Mr. Westwood-Booth admitted that he never considered drafting a script which acknowledged the truth, *i.e.*, that AAR had signed an agreement with Jones Lang to be its agent in order to trigger AAR's right of first refusal.  *See* A-358 (147:25-148:4). When Mr. Hara spoke with Mr. Feil after receiving Mr. Westwood-Booth's advice, he did not follow Mr. Westwood-Booth's "script." *See* A-280 (87:13-15).  However, while Mr. Hara testified that he told Mr. Feil that Jones Lang had made its "offer" at the "request" of AAR, he did not inform Mr. Feil of the written agency agreement binding Jones Lang to make the offer at the direction and control of AAR.  *See* A-282-283 (97:7-98:24); *see also* A-479.

As late as September 2012, AAR continued to hide from Feil 747 the facts surrounding its relationship with Jones Lang.  In response to an August 29, 2012 letter from AAR purporting to exercise the ROFR (*see* A-231), Feil 747's counsel sent a letter on September 10, 2012, to AAR's counsel (with a copy to Jones Lang) requesting that AAR and Jones Lang "provide . . . all information and communications . . . relating to the Jones Lang offer, the identity of the parties involved, and how such offer came about . . .'" A-233.  Despite this direct request, AAR and Jones Lang failed to produce the Agency Agreement or its Amendment, or any other documents relating to how Jones Lang's "offer came about."  A-417.

14

It was only after the commencement of this action that Feil 747 first learned about the existence of an agreement between AAR and Jones Lang when, on September 3, 2013, AAR's counsel informed the District Court of the agreement during an initial pre-trial conference at which the District Court granted Feil 747's request for limited discovery to address AAR's summary judgment motion. *See* A-479; *see also* A-108-111.

## SUMMARY OF ARGUMENT

The District Court's decision should be affirmed for the following reasons:

First, the Lease requires that an offer triggering the ROFR be made by a non-"Affiliate" of AAR or Feil 747. The Lease defines "Affiliate" as any entity whose management and policies are directed by either AAR or Feil 747. AAR, through a written agency agreement with Jones Lang, controlled Jones Lang's "management and policies" relating to the Garden City Property and hence Jones Lang was AAR's "Affiliate" under the Lease. As an "Affiliate," Jones Lang's offer to purchase the Garden City Property, as directed by AAR, could not and did not trigger the ROFR.

Second, Jones Lang is AAR's agent. As a matter of law, an agent's actions are imputed to its principal. As Jones Lang's offer is one and the same as an offer from AAR, the ROFR, which requires a third-party offer, was not triggered.

15

Third, Jones Lang's offer was a sham, and only a *bona fide* third-party offer could trigger the ROFR.

## ARGUMENT

## I. JONES LANG IS AN AFFILIATE OF AAR UNDER THE LEASE

It is undisputed that Jones Lang was AAR's agent and acted at the direction and control of AAR. Jones Lang's "offer" to purchase the Garden City Property was made as "part of the services . . . provided" by Jones Lang to AAR under the Agency Agreement. *See supra*, 12. As the District Court held, the Agency Agreement "effectively required Jones Lang LaSalle to do exactly what AAR wanted it to do: namely, make a purchase offer for the Garden City Property." SPA-08. AAR edited the material terms of Jones Lang's "offer" letter and dictated the offer price, the closing date, and even the timing of the "offer." *See supra,* 9-10. Jones Lang had no intention of ever taking title to the property. *Id.* 8-9. Indeed, Jones Lang neither sought nor received internal approval to spend the millions of dollars required to close such a transaction, without which Jones Lang could not purchase the property. *Id.* 9. In Jones Lang's own words, it was merely a "straw man" acting on AAR's behalf. *Id.*

The Lease defines "Affiliate" as "Persons . . . controlled by, controlling, or under common control with Tenant or Guarantor." *See supra*, 6. "Control" is defined in the Lease as "the possession directly or indirectly of *the power to direct*

16

***or cause the direction of the management and policies of a Person***, whether

through the ownership of voting securities, ***by contracts or otherwise***."

*Id.* (emphasis supplied).

Pursuant to the Agency Agreement and as demonstrated by the undisputed

evidence, Jones Lang's management was controlled by and scrupulously followed

the direction of its principal, AAR, in all matters relating to the Garden City

Property.  Simply stated, AAR directed the "management and policies" of Jones

Lang, and Jones Lang was AAR's "Affiliate" under the plain, unambiguous

meaning of the Lease.   Indeed, both AAR and Jones Lang acknowledged that they

were "Affiliates" under the Lease, as demonstrated by their efforts to disguise the

extent of their relationship and to avoid of any discussion of the terms "Affiliate"

and "Control."  Jones Lang warned Mr. Hara, AAR's Director of Real Estate, not

to inform Feil 747 of "his interpretation of what control and affiliate was" because

if he did so "that would not be a good event." *See supra*, 13-14.   AAR did not

reveal that it controlled Jones Lang or even the existence of the Agency Agreement

until the District Court ordered limited discovery to enable Feil 747 to respond to

AAR's summary judgment motion.  *See supra* 14-15.  As the District Court

concluded:

> . . . Jones Lang LaSalle was an "affiliate" of AAR.
> Paragraph 30 of the lease agreement, along with its
> related definitions, was plainly drafted to prevent just the
> sort of gamesmanship AAR attempted in this case.

17

> Indeed, the obvious reason to include such a clause in a long-term lease agreement is to prevent one counterparty from making a straw-man offer and effectively holding a call option on the property at a below-market price.

SPA-07.

On this appeal, AAR contends that the District Court erred by holding that AAR controlled or directed Jones Lang's management and policies. AAR argues that the definition of "control" under the Lease – *i.e.*, the "possession directly or indirectly of the power to direct or cause the direction of management and policies of the Person … by contracts or otherwise" – does not encompass Jones Lang's submission of the "offer," even though there is no dispute that it was submitted at AAR's direction and control pursuant to the Agency Agreement. *See* A-514; A-517; A-522 (AAR's Response to Feil 747's Statement of Additional Material Facts, ¶¶ 20, 26, 39, 40).

In an attempt to support its position and avoid the clear and unambiguous meaning of the Lease, AAR looks to the federal securities laws. Specifically, AAR cites to the definition of "Control" under the Securities Act of 1933 (*see* 17 C.F.R. § 230.405) and the Securities Exchange Act of 1934 (*see* 17 C.F.R. § 240.12b-2), which closely track the definition of "Control" under the Lease. AAR argues that the securities law definition of "Control" is interpreted as "the ability to participate in the day-to-day affairs of the corporation or to direct the corporation's officers and directors in setting corporate policies." Br. at 21. AAR maintains

18

that, under the securities law definition, it did not have "control" over Jones Lang because the Agency Agreement between AAR and Jones Lang only applied to the Garden City Property, and not to *all* of the "day-to-day affairs" of Jones Lang, a publicly held real estate advisory firm.[5]  Br. at 21.

First, it is well settled that where, as here, contract language is clear and unambiguous, it should be "'enforced according to the plain meaning of its terms.'" *Goldberg & Connolly v. New York Bancorp, Inc.,* 565 F.3d 66, 72 (2d Cir. 2009) (internal citations omitted);  *see also County of Suffolk v. Alcorn*, 266 F.3d 131, 138 (2d Cir. 2001) ("the parties' rights under . . . [an unambiguous] contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence").  Here the plain meaning of the phrase "management and policies" encompasses direction over management actions and

---

[5] AAR also asserts that it did not control Jones Lang because they are "separate companies."  Br. at 17.  The Lease, however, specifically refers to control derived by "contract or otherwise"; the fact that AAR does not own Jones Lang is not relevant.  Indeed, AAR concedes in its brief that *Telenor Mobile Communications v. Storm LLC*, 587 F. Supp. 2d 594, 606 (S.D.N.Y. 2008), which interpreted a substantially identical "Control" definition, "correctly held . . .[that] such power [to direct or cause the direction of management or policies] may arise through ownership, by contract or otherwise."  Br. at 22-23.  Here, "Control" arose "by contract" (the Agency Agreement), and "otherwise," (the laws of agency which governed the relationship between AAR and Jones Lang). *See Race v. Goldstar Jewellery, LLC*, 84 A.D.3d 1342, 1343 (2d Dep't 2011) ("'The basic tenet of a principal-agent relationship is that the principal retains control over the conduct of the agent with respect to matters entrusted to the agent, and the agent acts in accordance with the direction and control of the principal'") (internal citations omitted).

19

company policies concerning the matter or transaction at hand. The phrase is not limited, as AAR suggests, to control over **all** management actions and company policies. The fact that the interpretation of the securities law definition may differ from the plain meaning of the Lease's broad definition of "Control" does not entitle AAR to rewrite the definition to its liking. *See Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.,* 60 A.D.3d 61, 66 (1st Dep't 2008) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to a make a new contract for the parties"). Moreover, AAR's and Jones Lang's concealment of the extent of their relationship and avoidance of the meaning of "Control" and "Affiliate" in discussions with Mr. Feil (as doing so "would not be a good event") (*see supra*, 13-14) indicates that they fully understood the plain meaning of the Lease.

Second, under the securities law definition referenced by AAR, "Control" is given a narrow interpretation in order to limit the imposition of secondary liability for securities fraud on "control persons" under Section 20(a) of the 1934 Act. *See* Br. at 21, citing *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1162 (9th Cir. 1996) (holding that control under Section 20(a) must be based on "participation in day-to-day affairs," rather than control over "discrete" transactions, so as to avoid "an unwarranted expansion of secondary liability under

the securities laws") (cited in Br. at 21).[6]  No similar concern exists here.  As the District Court held "in the context of commercial agreements – as opposed to the related but conceptually distinct statutory context of securities fraud – 'control' has been interpreted even more broadly."[7]  SPA-08.

AAR's reliance on *Telenor Mobile*, 587 F. Supp. 2d 594 and *Madison Avenue Leasehold, LLC v. Madison Bentley Assoc., LLC*, 30 A.D.3d 1 (1st Dep't 2006) is unavailing. *See* Br. at 21-22.  *Telenor* does not address or support AAR's central contention that where a lease defines "control" utilizing the same language as the federal securities laws, "Control" must be defined and interpreted as if it arose under the federal securities law.  In *Madison Avenue*, the Court held that the meaning of an undefined term ("default") in a "standard form lease" could not be

---

[6] *Waldman v. Reidinger*, 423 F.3d 145 (2d Cir. 2009), a case cited by AAR in apparent support for its securities law interpretation (*see* Br. at 24-25), is inapposite.  In *Waldman*, the words "Affiliate" and "Control" were not defined in an agreement which settled claims raised in a securities fraud class action, and the parties in that litigation agreed to look to the securities law definitions of those terms.  Here, the dispute involves a real estate contract which does not contain any reference to or have anything whatsoever to do with the securities laws, and does not contain any agreement to rely on such definitions.

[7] Even under the securities laws analogy advanced by AAR, Jones Lang would still be AAR's "Affiliate" as AAR's agent.  *See Compudyne Corp. v. Shane,* 453 F. Supp. 2d 807, 831 (S.D.N.Y. 2006) ("In an agency situation, control person liability is properly pled by pleading control over the agent/primary violator while the agent is acting in the scope of their duties in connection with their illegal acts'"); *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d. 715, 721 (11th Cir. 2008) ("The legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws").

"divorced from the concepts of default and waiver well entrenched in the law of contracts and leaseholds," and must be "construed in light of well-settled landlord-tenant law." *Madison Avenue*, 30 A.D.3d at 6-7. Similarly, here "management and policies" should not be interpreted under securities laws which have no application or relevance to a real estate lease.[8]

Moreover, were the Lease to be interpreted as AAR suggests to permit AAR to trigger the ROFR through a straw man, the ROFR would be rendered meaningless. The act of a contractually-bound straw man (Jones Lang) is one and the same as the act of its principal (AAR). *See infra*, 25. If AAR can direct its undisclosed agent to trigger the ROFR, the Lease provision requiring an offer from a third party in order to trigger the ROFR is superfluous. A contract should not be interpreted to render its terms meaningless. *See Olin Corp. v. American Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("Any interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible'") (internal citation omitted); *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd,

---

[8] Nor does AAR explain why, if the parties intended that the Lease's "Control" definition have the same meaning as "control" under the federal securities laws, the parties would not have simply written that "Control shall have the same meaning as set forth in under the Securities Act of 1933 and the Securities Exchange Act of 1934." They did not.

commercially unreasonable, or contrary to the reasonable expectations of the parties") (internal citations omitted).

Also misleading is AAR's attempt to re-characterize the ROFR language as an option (*see* Br. at 9-10); such characterization is not only an improper attempt to rely on extrinsic evidence, *i.e.*, Mr. Romenesko's testimony (*see County of Suffolk, supra* 19), but it is squarely contradicted by the Lease terms and by the very testimony of Mr. Romenesko. The heading of Paragraph 30 of the Lease is "Right of First Refusal." Subparagraph (a) of that paragraph states that "Tenant shall have a right of first refusal to purchase the Premises . . .." *See supra*, 5. At his deposition, Mr. Romenesko admitted that an option to repurchase the Garden City Property would have violated AAR's covenants with its lenders, and the ROFR language was therefore carefully drafted to avoid it being so construed. *See supra*, 6-7. Having drafted the ROFR provision so that it could not be construed as an option, AAR may not now maintain that it is an option simply because that interpretation suits its present purposes.

Feil 747 purchased the Garden City Property and was assigned the Lease in reliance upon the Lease's clear and unambiguous terms. Feil 747 did not and could not anticipate, as AAR suggests, that AAR and the original lessor, iStar, had an undisclosed understanding that a sham offer from a straw man could trigger the right of first refusal. *See* Br. at 26. Rather, Feil 747 had the right to, and did rely

23

upon, the plain and unambiguous language of the Lease.[9]  *See Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (the principle "that . . . . [a] writing . . . should be enforced according to its terms'" has "special import 'in the context of real property transactions, where commercial certainty is a paramount concern.'") (internal citations omitted); *Matter of Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995) ("'[C]lear, complete writings should generally be enforced according to their terms" so as to impart "stability to commercial transactions'") (internal citations omitted).  AAR should not be permitted to re-write the Lease terms.

## II.  THE ROFR WAS NOT TRIGGERED BECAUSE JONES LANG'S ACTS ARE IMPUTED TO AAR

AAR and Jones Lang entered into an agreement titled "Exclusive Agency Agreement," under which Jones Lang submitted an "offer" to Feil 747 in order to attempt to trigger the right of first refusal, in return for AAR's promise to pay Jones Lang $365,000 if AAR ultimately acquired the Garden City Property.  *See supra*, 11.  AAR "specifically engaged" Jones Lang to submit the purchase offer, and Jones Lang understood that "sending the . . .  letter [was] part of the services provided" under the Agency Agreement. *See supra*, 12.  AAR exercised complete

_____

[9] AAR's argument that the District Court erred by ignoring "the undisputed evidence of the intent and business expectations of the contracting parties" is without merit.  Br. at 35.  The Lease is unambiguous.  Accordingly, there was no need for the District Court to consider Mr. Romenesko's testimony.

control over Jones Lang's submission of the purported offer to purchase the

Garden City Property; AAR even dictated the material terms of Jones Lang's

"offer" letter which Jones Lang only sent after receiving direction from AAR to

do so and knowing that "AAR was comfortable with the letter and the content."

*See supra*, 9-10. Jones Lang never had any intention of taking title to the property

itself, and could not "envision a situation" in which Jones Lang would do

"anything that wasn't consistent with . . . [its] agreements with AAR" to assist

AAR in acquiring the Garden City Property. *See supra* 12. Jones Lang was

indisputably AAR's agent.

It is black letter law that "the acts of agents, and the knowledge they acquire

within the scope of their authority are presumptively imputed to their principals."

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010). *See also Holmes v. Lorch*,

329 F. Supp. 2d 516, 529-30 (S.D.N.Y. 2004) ("In New York, '[t]he general rule

is that the acts and knowledge of an agent acting within the scope of his agency

are imputed to the agent's principal'") (quoting *In re Maxwell Newspapers, Inc.*,

151 B.R. 63, 69 (Bankr. S.D.N.Y. 1993); *Old Republic Ins. Co. v. Hansa World*

*Cargo Services, Inc.*, 51 F. Supp. 2d 457, 471 (S.D.N.Y. 1999) ("If two parties

effectuate an agency relationship between themselves, the agent's knowledge is

imputed to the principal and the principal becomes responsible for the agent's acts

within the scope of the bestowed authority").

The Lease explicitly states that the triggering offer must come from a third party. Accordingly, inasmuch as Jones Lang's act of sending the "offer" letter is imputed to AAR, the ROFR was not triggered.

## III. JONES LANG'S "OFFER" DID NOT TRIGGER THE ROFR BECAUSE IT WAS NOT GENUINE

Inherent in any right of first refusal is the expectation of a *bona fide* offer. *See Burzynski v. Travers*, 636 F. Supp. 109, 111-112 (E.D.N.Y. 1986) (the holder of a right of first refusal "is usually deemed to be entitled to match any acceptable *bona fide* third party offer" even where the right of first refusal clause at issue does not specify "whether the right was triggered by a *bona fide* third party offer"); *see also Quigley v. Capolongo*, 53 A.D.2d 714, 715 (3rd Dep't 1976).[10]

The undisputed evidence establishes that Jones Lang's offer was not *bona fide*. It was made solely in an attempt to trigger the ROFR for AAR and without any intention of Jones Lang ever purchasing the Garden City Property.

---

[10] Additionally, Jones Lang's offer letter was not "binding on either party until made part of a mutually executed PSA," and was not "intended to constitute the agreement of the owner(s) to negotiate a sale of the Properties to Purchaser, or for the Purchaser to negotiate a purchase of the Properties from the owner(s)." *See supra*, 12-13. Thus, the Jones Lang "offer" is not an *offer* as a matter of law because even if signed, it would not have created a contract between Feil 747 and Jones Lang. See *Farrago Adv., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001) ("Under New York law, 'an offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract . . . As long as 'some further act' by a supposed offeror is necessary in order for a contract to take effect, 'there is as yet no offer'") (citations omitted).

In an acknowledgment that the ROFR was not *bona fide*, AAR argues that the Lease contemplates that the ROFR could be triggered by a sham offer.[11]   If that were so, it would lead to a nonsensical result.  In a round of sham bids, AAR's straw man could submit a below market offer – as it in fact did – of $16.28 million and Feil 747's straw man could submit an offer far above market value, leaving AAR with only an inflated and prohibitive offer to match.  The only plausible, commercially reasonable interpretation (which, not surprisingly, comports with case law (*see supra*, 26), that avoids AAR's skewed interpretation is that the triggering offer must be *bona fide*.  *See Lipper Holdings, supra* 22-23 ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties"); *Greenwich Capital Financial Prods. Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) (same). Jones Lang's offer was a sham, and therefore the ROFR was not triggered.

---

[11] AAR asserts that the purpose of the ROFR provision "was to enable the intermediary to trigger AAR's option rights; ***the purpose was not to enable the intermediary to acquire the Garden City Property for itself***." (emphasis added). Br. at 33.  However, the ROFR provision does not use the word "intermediary," let alone explicitly or implicitly contemplate the use of an "intermediary" to do what the parties themselves are prohibited from doing.

## **CONCLUSION**

For the foregoing reasons, the District Court's Opinion and Order, granting summary judgment in favor of Feil 747, should be affirmed.

Dated: New York, New York
      November 21, 2014

                         LEVIN & GLASSER, P.C.


                    By: /s/ David J. Nathan
                       David J. Nathan
                       Steven I. Levin
                       Michael J. Firestone

                    420 Lexington Avenue, Suite 2818
                    New York, NY 10170
                    Tel: (212) 867-3636

                    *Attorneys for Defendant-Appellee*
                    *Feil 747 Zeckendorf Blvd LLC*